**Sherman GOTTLIEB, Plaintiff,**

**v.**

**CARNIVAL CORPORATION, Defendant.**

**No. 04 Civ. 4202 (ILG).**

United States District Court, E.D. New York.

Feb. 5, 2009.

Andre K. Cizmarik, Anthony J. Viola, Edwards & Angell LLP, New York, NY, for Plaintiff.

Joseph J. Saltarelli, Hunton & Williams LLP, New York, NY, for Defendant.

*MEMORANDUM AND ORDER*

GLASSER, Senior District Judge:

**INTRODUCTION**

The plaintiff has brought federal and state causes of action alleging that the corporate defendant faxed unsolicited advertisements to him without his prior express invitation or permission in violation of the Telephone Consumer Protection Act of 1991, Pub.L. No. 102–243, § 227, 105 Stat. 2394, 2395 (1991), and New York General Business Law § 396–aa. Both parties now move for summary judgment. The record presents no genuine issue of material fact, and the Court grants summary judgment in favor of the plaintiff as to the federal claim, finding that the defendant faxed the plaintiff advertising materials without his express invitation or permission and that an "established business relationship" exemption for fax advertisements is unavailable as a defense.

**FACTS**

Defendant Carnival Corporation ("Carnival") is a global cruise company that is organized pursuant to the laws of Panama and maintains its principle place of business in Miami, Florida. Amended Complaint ¶ 8. Carnival solicits vacationers from all over the world to book trips on its fleet of cruise ships, often by way of travel agencies. Declaration of Joseph Saltarelli ("Saltarelli Decl."), dated Aug. 31, 2007, Ex. C at 47. Carnival maintains an "agency profile" on its internal computer database for each travel agent it works with on which it records the travel agency's contact information and any bookings the agency procures.

In March of 1999, Carnival created an agency profile for Plaintiff Sherman Gottlieb, the sole owner and operator of "SMG Travel." Defendant's Local Rule 56.1 Statement ("Def. 56.1 Statement"), dated Aug. 31, 2007, ¶¶ 2, 3; Plaintiff's Local Rule 56.1 Statement ("Pl. 56.1 Statement"), dated July 13, 2007, ¶ 1; Declaration of Frederick Stein ("Stein Decl."), dated Aug. 31, 2007, Ex. A. Precisely how this

profile originated is unclear. There is no written agreement between the parties, and Gottlieb does not remember either registering to become Carnival's agent or providing Carnival his fax number. Plaintiff's Local Rule 56.1 Counter–Statement ("Pl. 56.1 Counter–Statement"), dated Oct. 26, 2007, ¶ 2; Corrected Declaration of Andre K. Cizmarik ("Cizmarik Decl."), dated Oct. 27, 2007, Ex. B at 50–52.

SMG Travel's profile included its fax machine telephone number. Once a travel agency profile included a fax number, it was Carnival's practice to send the agency faxes promoting its cruises and rates. Saltarelli Decl., Ex. C at 63–64. At the time, Carnival did not seek permission before faxing promotional materials to any agent and did not cease transmitting them until an agent voiced his objection. *See* Saltarelli Decl., Ex. C at 47.

In 2000, Gottlieb began receiving fax advertisements from Carnival that provided information on its cruises and rates. Pl. 56.1 Statement ¶ 3. From the record, it appears that he continued to receive these fax advertisements for at least three to four years.[1] Gottlieb avers that, in total, he has received 1,387 fax advertisements from Carnival. Pl. 56.1 Statement ¶ 14.

Carnival does not dispute sending Gottlieb such faxes but believes the total to be only 540. Defendant's Local Rule 56.1 Counter–Statement, dated Aug. 31, 2007, ¶ 8. The record contains no evidence to suggest that Gottlieb ever expressly invited or permitted Carnival to fax these materials to him.[2]

It was not until February 5, 2004, that Gottlieb contacted Carnival for the purpose of booking a cruise for one of his customers,[3] Def. 56.1 Statement ¶ 19, but by that time, Carnival designated him an "inactive" agent and required him to reactivate his status as an agent by entering into an agency agreement. Def. 56.1 Statement ¶¶ 17, 20–21; *see* Stein Decl., Ex. A. At the bottom of the agency agreement form that he was to complete, Gottlieb was allowed to mark his preference regarding "booking confirmations" by email, fax, or regular mail. *See* Cizmarik Decl., Ex. F; Stein Decl., Ex. C. Gottlieb indicated on that form that he would prefer to receive booking confirmations by fax. The agency agreement made no reference to Gottlieb's preference regarding promotional materials, and nothing on the form he submitted to Carnival indicated that he was inviting or permitting the

**1.** The record is not clear as to when Gottlieb stopped receiving fax advertisements from Carnival or whether he still receives them to this day. *See* Pl. 56.1 Statement ¶¶ 8–14.

**2.** Gottlieb alleges in his deposition that he contacted Carnival by fax and telephone on four occasions from 2000 to 2001 to request that Carnival stop faxing him the promotional materials, requests that Gottlieb insists Carnival ignored. Pl. 56.1 Statement ¶¶ 4–7; Cizmarik Decl., Ex. B at 73, 75, 77, 81. Carnival has no record of receiving any such oral or written request, and Gottlieb has not proffered any evidence to corroborate his testimony. Def. 56.1 Counter–Statement ¶¶ 4–7; Saltarelli Decl., Ex. C at 43.

**3.** In his 56.1 Statement, the plaintiff avers that he booked only one cruise on a Carnival

ship between 1999 and February of 2004 and that the trip was booked through "Cruise Value Center," a cruise consolidator that purchases blocks of cabins from cruise operators and then resells them to travel agents. Pl. 56.1 Statement ¶¶ 15–16. However, in his deposition, Gottlieb stated that he had booked "several" cruises with Carnival, the last of which was in 2004. Cizmarik Decl., Ex. B at 55–56. Carnival's records do not show that it did any business with Gottlieb from 1999 to 2004 other than faxing him confirmations in March of 2000 and in February and April of 2002, all of which corresponded to various bookings that SMG Travel made through Cruise Value Center. Def. 56.1 Counter–Statement ¶ 16.

transmission of promotional faxes.[4] Gottlieb's expressly stated preference for faxing booking confirmations only is confirmed by Carnival's update of his agency profile that reflected his preference limitation. *See* Stein Decl., Ex. A.

## PROCEDURAL HISTORY

The plaintiff filed his complaint against Carnival in this Court on September 28, 2004, and subsequently amended that complaint on November 11, 2004. The plaintiff filed for summary judgment on July 13, 2007, and the defendant filed its notice of cross-motion for summary judgment on August, 31, 2007.

## DISCUSSION

### 1. Telephone Consumer Protection Act of 1991

The statute in effect during the period when the fax transmissions were sent to SMG Travel was the Telephone Consumer Protection Act of 1991 ("TCPA"), Pub.L. No. 102–243, § 227, 105 Stat. 2394, 2395 (1991) (current version 47 U.S.C. § 227 (2005)). In amending the Federal Communications Act of 1934, the TCPA prohibited certain commercial practices involving the use of telephone equipment including (1) calls by automatic telephone dialing systems or artificial or prerecorded voice to certain categories of telephone lines, § 227(b)(1)(A); (2) calls to residential phones using artificial or prerecorded voice without prior consent, § 227(b)(1)(B); (3) use of an automatic telephone dialing system such that two or more lines of a multi-line business were called simultaneously, § 227(b)(1)(D); and (4) use of "any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine." § 227(b)(1)(C). The statute created a private right of action allowing individuals affected by violations of the TCPA to enjoin future violations and to recover $500 in damages for each violation or treble damages if the violations were willful and knowing. § 227(b)(3).

The TCPA defined "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission." § 227(a)(4). The statute also defined a "telephone solicitation" as the "initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person...." § 227(a)(3). Exempted from this prohibition regarding telephone solicitations are calls to persons who have given prior express invitation or permission, calls made by tax exempt nonprofit organizations, and calls to parties with whom the caller has an established business relationship ("EBR"). *See* § 227(a)(3). This EBR exemption for fax advertisements was contained in the House of Representatives' version of the bill. The Senate, however, subsequently removed from the bill the EBR exemption for fax advertisements but retained the exemption for telephone solicitations. *See Weitzner, M.D. v. Iridex*

---

4. After completing the agency agreement, Gottlieb faxed it to Carnival. A comparison of the agency agreement that Gottlieb says he faxed and the agreement that Carnival received reflects a discrepancy. On Gottlieb's version of the agreement, the words "only confirmations" are written by hand next to the checked box labeled "Fax." Carnival's version is identical in every respect except for the additional handwriting. Pl. 56.1 Statement ¶ 33; Cizmarik Decl., Ex. F. Because neither copy serves as evidence that Gottlieb expressly invited or permitted Carnival to fax promotional materials, this discrepancy is immaterial. *See* Discussion, *infra*.

*Corp.*, No. 05 Civ. 1254(RJD), 2006 WL 1851441, at *4 (E.D.N.Y. June 29, 2006) (discussing the legislative history).

### 2. Federal Communications Commission interpretation

Congress in § 227(b)(2) expressly delegated authority to the Federal Communications Commission ("FCC") to promulgate regulations to implement the TCPA, stating:

> The Commission shall prescribe regulations to implement the requirements of this subsection. In implementing the requirements of this subsection, the Commission (A) shall consider prescribing regulations to allow businesses to avoid receiving calls made using an artificial or prerecorded voice to which they have not given their prior express consent....

Congress also expressly limited the FCC's authority to create exemptions from the statute's prohibitions, stating:

> the Commission ... may, by rule or order, exempt from the requirements of paragraph (1)(B) of this subsection [prohibiting artificial voice or prerecorded calls to residential telephone lines] ... (i) calls that are not made for a commercial purpose; and (ii) such classes or categories of calls made for commercial purposes as the Commission determines (I) will not adversely affect the privacy rights that this section is intended to protect; and (II) do not include the transmission of any unsolicited advertisement.

§ 227(b)(2)(B). Thus, the only EBR exemption from the TCPA's prohibitions that the FCC was expressly authorized to make was regarding *telephone* calls to residential phone lines that used an artificial or pre-recorded voice. *See* § 227(b)(2)(B).

On April 10, 1992, the FCC proposed new rules implementing provisions of the TCPA and requested public comment on them. *See* Notice of Proposed Rulemaking, 7 F.C.C.R. 2736 (1992). After receiving comments from approximately 240 parties, the FCC issued a Report on October 16, 1992, that discussed the comments and the costs and benefits associated with the proposed rules. *See In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* 7 F.C.C.R. 8752 (1992). In regards to the rules implementing the prohibition on fax advertisements, the FCC stated plainly that "[i]n banning telephone facsimile advertisements, the TCPA leaves the Commission without discretion to create exemptions from or limit the effects of the prohibition (see § 227(b)(1)(C)); thus, such transmissions are banned in our rules as they are in the TCPA." 7 F.C.C.R. at 8784 n. 87.

Notwithstanding an express Congressional limitation on the Agency's rulemaking authority to provide for any exemption for fax solicitations, the FCC proceeded to interpret the statute to provide that "facsimile transmission from persons or entities who have an established business relationship with the recipient can be deemed to be invited or permitted by the recipient." *Id.* In support of that interpretation, the FCC relied on the EBR exemption contained in the TCPA for otherwise prohibited telephone calls to residential lines on the grounds that such calls did not adversely affect the recipient's privacy interests and reasoned, therefore, that facsimile transmissions were equally benign. *See* 7 F.C.C.R. at 8770, ¶ 34.

This interpretation was not incorporated into the FCC's final rules implementing the TCPA that were issued on October 23, 1992. *See* 57 F.R. 48333 (1992) (amending title 47 of the Code of Federal Regulations to include § 64.1200). The rules regarding fax advertisements stated simply that "[n]o

person may ... use a telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine." 57 F.R. at 48335. No EBR exemption was provided. The rules applied the EBR exemption only to telephone calls. An EBR was defined as "a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of an inquiry, application, purchase or transaction by the residential subscriber regarding products or services offered by such person or entity, which relationship has not been previously terminated by either party." *Id.* at 48335–36.

### 3. Reconsideration of the FCC interpretation and the Junk Fax Prevention Act of 2005

On July 3, 2003, the FCC issued a Report declaring "[w]e now reverse our prior conclusion that an established business relationship provides companies with the necessary express permission to send faxes to their customers." *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 F.C.C.R. 14014, 14127–28 at ¶ 189 (2003). The FCC chose to delay the effective date of the revised interpretation, however, because Congress was considering an amendment to the TCPA that would codify an EBR exemption for fax advertisements. *See In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 19 F.C.C.R. 20125, ¶¶ 1, 5 (2004) (discussing House approval of a bill to amend the TCPA's fax advertisement provision); 20 F.C.C.R. 11424, ¶ 1 (2005).

On July 9, 2005, Congress amended the TCPA by codifying the EBR exemption for fax advertisements. *See* The Junk Fax Prevention Act of 2005 ("JFPA"), Pub.L. No. 109–21, 119 Stat. 359 (2005) (stating "Section 227(b)(1)(C) of the Communications Act of 1934 is amended to read as follows: [it shall be unlawful for any person] (C) to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement, unless (i) the unsolicited advertisement is from a sender with an established business relationship with the recipient ...". A Senate Report described this amendment as "a limited statutory exception to the current prohibition against the faxing of unsolicited advertisements to individuals without their 'prior express invitation or permission'" when the sender had an established business relationship with the recipient. S.Rep. No. 109–76, at 1 (2005). The same Senate Report recognized that, before it was amended, the TCPA "contain[ed] no ... exceptions for junk faxes" other than those expressly invited or permitted, and "[did] not authorize the FCC to create any additional exceptions." *Id.* No language in the JFPA suggested that the amendment would apply retroactively.

### 4. Standard of Review

Summary judgment is warranted if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden to demonstrate that no genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e)(2). The non-moving party, however, "may not rely on mere conclusory allega-

tions nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.1998). The Court is compelled to draw all reasonable inferences in favor of the nonmoving party. *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. A genuine issue exists if a reasonable jury could find in favor of the nonmoving party, and a fact is "material" only if it would have some effect on the outcome of the cause of action. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### 5. Cause of action under the TCPA

During the period in which the faxes at issue were sent and this cause of action accrued, a party violated the TCPA if it transmitted unsolicited advertisements by fax to another party without the recipient's express invitation or permission to do so. *See* Telephone Consumer Protection Act of 1991, § Pub.L. No. 102–243, § 227(b)(1)(C), 105 Stat. 2394, 2396 (1991). Here, it is undisputed that Carnival sent Gottlieb faxes that promoted its cruises and stated its rates, and Carnival has proffered no evidence to suggest that Gottlieb expressly invited or permitted it to fax advertising materials to him at any time. *See Fed. Trade Comm'n v. Morton Salt Co.,* 334 U.S. 37, 44–45, 68 S.Ct. 822, 92 L.Ed. 1196 (1948) ("the burden of proving justification or exemption under a special exception to the prohibitions of a statute generally rests on one who claims its benefits"); *Black's Law Dictionary* 620 (8th ed. 2004) (defining "express" as "clearly and unmistakably communicated; directly stated"). Carnival argues (1) that the Court may deem the faxes as expressly invited or

permitted based on its claimed EBR with Gottlieb, (2) that the faxes were informational flyers and not "unsolicited advertisements," (3) that the purpose of the TCPA is to protect residential telephone subscribers and not to protect a business such as SMG Travel, and (4) that the statute of limitations has run on the TCPA claim.

### a. Express permission and the "established business relationship" exemption

■ As discussed *supra,* the TCPA enacted by Congress and in effect prior to July of 2005 provided for an EBR exemption for telephone solicitations only, *see* § 227(a)(3), and not for "unsolicited advertisements" transmitted by fax. *See* §§ 227(a)(4), (b)(1)(C). Nevertheless, Carnival argues that this Court should defer to the FCC interpretation that a fax did not constitute an "unsolicited advertisement" if there was an EBR because, in such a context, the fax would be deemed invited or permitted. *See* 7 F.C.C.R. 8752, 8784 n. 87 (1992).

■ Pursuant to the Administrative Procedure Act, 5 U.S.C. § 702, this Court must "hold unlawful and set aside any agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...." The Supreme Court in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), held that "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent."[5] *See also Air India v.*

---

5. The defendant argues that this Court does not have jurisdiction to set aside the FCC interpretation at issue because 28 U.S.C. § 2342 provides that the "court of appeals ...

has exclusive jurisdiction to enjoin, set aside, suspend ..., or determine the validity of (1) all final orders of the Federal Communications Commission made reviewable by section

*Brien,* 239 F.R.D. 306, 314 (E.D.N.Y.2006) (Glasser, J.) ("Administrative agency Regulations are subject to judicial scrutiny ensuring that the Regulation does not exceed the scope of the statute pursuant to which it was promulgated and is not contrary to the congressional intent behind the statute"). A reviewing court must first consider whether Congress has spoken directly to the question at issue, making its intent clear. *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778. If so, "that is the end of the matter," for the Congressional intention on the precise question at issue is the law and must be given effect. *Id.* at 842–843, 843 n. 9, 104 S.Ct. 2778. However, when Congress has not directly addressed the question at issue, the statute being silent or ambiguous, the Court must determine whether "the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778.

The deference that *Chevron* commands is most often applied in situations in which Congress has authorized an agency to engage in the process of rulemaking or adjudication. *United States v. Mead Corp.,* 533 U.S. 218, 229, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). When Congress has explicitly left gaps in the statute for the agency to fill, such express delegation of authority to expound on the statute is given "controlling weight" unless the regulations are "arbitrary, capricious, or manifestly contrary to the statute." *Chevron,* 467 U.S. at 843–44, 104 S.Ct. 2778. When such delegation is implicit, the agency's regulations deserve deference if they are a reasonable interpretation of the statute. *Id.* at 844, 104 S.Ct. 2778.

The Court concludes that, here, the Congressional intent is clear: the TCPA does not provide an EBR exemption for fax advertisements. First, the statute addresses the issue squarely. An EBR exemption appears in the definition of "telephone solicitation" but is absent from the definition of "unsolicited advertisement." *Compare* § 227(a)(3) (defining a "telephone solicitation" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services ... but such term does not include a call or message ... to any person with whom the caller has an established business relationship") with § 227(a)(4) (defining an "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission"). "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Rodriguez v. United States,* 480 U.S. 522, 525, 107 S.Ct. 1391, 94 L.Ed.2d 533 (1987).

Second, the plain language of the §§ 227(b)(1)(C) and (a)(4) provides that all fax advertisements are prohibited except for those expressly invited or permitted by the recipient. *See* § 227(b)(1)(C) ("it shall be unlawful for any person ... to use any telephone facsimile machine, computer, or other device to send an unsolicited adver-

---

402(a) of title 47." *See* Defendant's Memorandum of Law, dated Aug. 31, 2007, at 17; Defendant's Reply Memorandum of Law, dated Nov. 21, 2007, at 12. This argument fails to distinguish between FCC orders and FCC interpretations of federal statutes. *See Wilson v. A.H. Belo Corp.,* 87 F.3d 393, 396–97 (9th Cir.1996) (the court of appeals has exclusive jurisdiction to review the validity of FCC *rulings* ). While the former may only be challenged pursuant to § 2342, the latter do not deserve the Court's deference if clearly in conflict with the intent of Congress.

tisement to a telephone facsimile machine") and § 227(a)(4), *supra.* No additional exemptions are implied.

Third, the legislative history does not suggest that the intent of Congress was contrary to the plain language of the statute. *See I.N.S. v. Cardoza–Fonseca,* 480 U.S. 421, 433 n. 12, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (where "the plain language of this statute appears to settle the question ... we look to the legislative history to determine only whether there is 'clearly expressed legislative intention' contrary to the language which would require us to question the strong presumption that Congress expresses its intent through the language it chooses"). Indeed, the legislative history supports the Court's construction. The EBR exemption applied to both fax advertisements and telephone solicitations in the House version of the TCPA but was later removed from the fax advertisement provision in the Senate version. *See Weitzner, M.D. v. Iridex Corp.,* No. 05 Civ. 1254(RJD), 2006 WL 1851441, at *7 (E.D.N.Y. June 29, 2006); *see also* 18 F.C.C.R. at 14127 n. 698. This fact "strongly militates against a judgment that Congress intended a result that it expressly declined to enact." *Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 200, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974). Additionally, a Senate Report accompanying the TCPA stated "[w]hile telemarketers will be responsible for determining whether a potential recipient of an advertisement, in fact, has invited or given permission to receive such fax messages, such a responsibility is the minimum necessary to protect unwilling recipients from receiving fax messages that are detrimental to the owner's uses of his or her fax machine." S.Rep. No. 102–178, at 7–8, 1991 U.S.C.C.A.N. 1968, at 1975–76 (1991).

Carnival argues, however, that the incorporation of an EBR exemption for fax advertisements into the JFPA "supports the view that [Congress] always intended for there to be such a defense to claims brought pursuant to § 227(b)(1)(C)." Def. Mem. at 18. The Court notes, first, Justice Harlan's admonition in *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 4 L.Ed.2d 334 (1960), that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." That notwithstanding, the Court considers *Red Lion Broad. Co., Inc. v. Fed. Commc'ns Comm'n,* 395 U.S. 367, 380–81, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), which Carnival cites for the proposition that "[s]ubsequent legislation declaring the intent of an earlier statute is entitled to great weigh in statutory construction." In *Red Lion,* the Supreme Court considered FCC regulations requiring radio and television broadcasters who discuss public issues to give fair coverage to both sides of those issues, better known as the fairness doctrine. 395 U.S. at 370, 89 S.Ct. 1794. The regulations were distinct from the statutory requirement of 47 U.S.C. § 315 of the Communications Act of 1934 that equal time be allotted to all qualified candidates for public office. *Id.* In 1959, Congress amended § 315 to exempt certain appearances of political candidates on news programs from the equal time requirement, but in doing this, Congress also stated that the amendment created no exception "from the obligation imposed upon them under this Act to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance." *Id.* at 380, 89 S.Ct. 1794 (quoting Act of September 14, 1959, § 1, 73 Stat. 557, amending 47 U.S.C. § 315(a)). Justice White noted that

> [t]his language makes it very plain that Congress, in 1959, announced that the phrase 'public interest,' which had been

in the Act since 1927, imposed a duty on broadcasters to discuss both sides of controversial public issues. In other words, the amendment vindicated the FCC's general view that the fairness doctrine inhered in the public interest standard. Subsequent legislation *declaring* the intent of an earlier statute is entitled to great weight in statutory construction.

*Id.* at 380–381, 89 S.Ct. 1794 (emphasis added).[6]

The present case can be readily distinguished. Whereas the 1959 amending statute in *Red Lion* definitively stated the intent of the original statute and thereby "vindicated" the FCC's regulations, the JFPA did not *declare* that the TCPA as enacted in 1991 created an EBR exemption for fax advertisements. *See* Pub.L. 109–21, 119 Stat 359 (2005). Rather, the legislative history establishes that Congress intended the JFPA to *create* an EBR exemption for faxes. *See* S.Rep. No. 109–76, at 1 ("The purpose of this legislation [is] to *create* a limited statutory exception . . .") (emphasis added). Indeed, the Senate Report accompanying the JFPA was unequivocal: the TCPA "prohibits anyone from faxing unsolicited advertisements without 'prior express invitation or permission' from the recipient. The statute contains no other exceptions for junk faxes, and does not authorize the FCC to create any additional exceptions." *Id.*

Given the plain language of the TCPA and its legislative history, it is clear that Congress limited the EBR exemption to "telephone solicitations," and the only exemption from the prohibition on fax adver-

tisements required the sender to obtain the express invitation or permission of the recipient. *Accord Onsite Computer Consulting Servs., Inc. v. Dartek Computer Supply Corp.*, No. 05 Civ. 000108, 2006 WL 2771640, at *2 (Mo.Cir.Ct. May 17, 2006) ("[t]he plain language of the statute and legislative history make clear that there is no EBR defense for facsimile advertisements"); *Sterling Realty Co. v. Klein*, 2005 TCPA Rep. 1353 (N.J.Super.Ct. Mar. 21, 2005) ("such an exemption is not supported by the plain language of the statute"); *Altman v. Inside Edge, Inc.*, 2004 TCPA Rep. 1291 (Mo.Cir.Ct. Aug. 2, 2004) ("There is simply no 'established business relationship' exemption [from] the prohibition on sending fax advertisements. That exemption applies only to telemarketing calls"); *Clean Carton Co., Inc. v. Prime TV, LLC*, 2004 TCPA Rep. 1294 (Mo.Cir.Ct. July 13, 2004) ("There is no ambiguity here to open the door for an administrative agency's construction"); *Jemiola v. XYZ Corp.*, 126 Ohio Misc.2d 68, 802 N.E.2d 745, 749 (Ohio Com.Pl.2003) ("Consent may not be inferred from . . . the existence of a previous business relationship. . . . '[P]rior express invitation or permission' is the sole statutory defense"); *Penzer v. MSI Marketing, Inc.*, 2003 TCPA Rep. 1142 (Fla. Cir. Ct. April 2, 2003) ("the only logical conclusion that can be drawn . . . is that Congress did not intend to create an "established business relationship" exception to the transmission of unsolicited facsimile advertisements"); *Kondos v. Lincoln Property Co.*, 2001 TCPA Rep. 1036 (Tex.Dist.Ct. July 12, 2001) ("the statute does not encompass

---

**6.** The phrase "public interest" to which Justice White referred was first included in the Radio Act of 1927, § 4, 44 Stat. 1163 (1927), which established the Federal Radio Commission ("FRC") to allocate radio frequencies among competing applicants "in a manner responsive to the public 'convenience, inter-

est, or necessity.' " *Red Lion*, 395 U.S. at 376–77, 377 n. 6, 89 S.Ct. 1794. The FRC, the predecessor of the FCC, shortly thereafter "expressed its view that the 'public interest requires ample play for the free and fair competition of opposing views.' " *Id.* at 377, 89 S.Ct. 1794.

implied permission"); *Biggerstaff v. Websiteuniversity.com, Inc.*, 2001 TCPA Rep. 1025 (S.C.Ct.Com.Pls. Mar. 20, 2001) ("Congress singled out unsolicited faxes for the most stringent restrictions imposing strict liability").

Notwithstanding that the Court is not to determine whether the agency's construction is permissible when the statute itself is clear, *see Chevron*, 467 U.S. at 842, 104 S.Ct. 2778 ("[i]f the intent of Congress is clear, that is the end of the matter"), the Court also concludes that the FCC's interpretation was plainly contrary to the express terms of the statute and to the scope of the delegated authority.[7] Carnival may not avail itself of an EBR exemption in defense of its conduct.

### b. "Unsolicited advertisement"

■ Carnival also avers that the faxes at issue are not "unsolicited advertisements" but "informational flyers" that are intended not to entice Gottlieb to purchase Carnival's services for himself but to inform him in his capacity as a travel agent. *See* Defendant's Memorandum of Law in Opposition ("Def. Mem."), dated Aug. 31, 2007, at 8–10. Carnival argues, citing

*Rudgayzer & Gratt v. Enine, Inc.*, 4 Misc.3d 4, 779 N.Y.S.2d 882 (N.Y.Sup.Ct. 2004) and *Stern v. Bluestone*, 47 A.D.3d 576, 850 N.Y.S.2d 90 (2008), that a party violates the TCPA only when he intends "to solicit, i.e., encourage *the recipient* to purchase the 'property, goods, or services' described in the advertisement." Def. Mem. at 8–9 (emphasis in the original); *see also* Defendant's Reply Memorandum of Law ("Def. Reply Mem."), dated Nov. 21, 2007, at 8 ("it is just common sense to interpret "advertisement" . . . as referring to printed material intended to entice *the reader*"). Carnival argues that it never intended to solicit Gottlieb and therefore did not violate the TCPA.

Neither *Rudgayzer* nor *Stern* supports the proposition that the sender must *intend* to solicit the recipient rather than a third party.[8] Moreover, the statutory definition of "unsolicited advertisement" is unmistakably clear in its breadth: "*any* material advertising the availability or quality of *any* property, goods, or services which is transmitted to *any* person . . . ." § 227(a)(4) (emphasis added). The faxes at issue here certainly fall under this definition. Their purpose was none other than

---

7. Other courts that have found the TCPA to be ambiguous as to this precise issue have also held that the FCC's interpretation is not a permissible construction of the statute. *See Onsite Computer*, 2006 WL 2771640 at *2 ("an 'established business relationship' can not be considered to be equivalent to 'express permission or invitation' since the two terms are used separately and disjunctively in the statute"); *Travel Travel, Kirkwood, Inc. v. Jen N.Y. Inc.*, 206 S.W.3d 387, 392 (Mo.App.2006) ("implicit consent is insufficient under the law"); *Chair King, Inc. v. GTE Mobilnet of Houston, Inc.*, 135 S.W.3d 365, 394 (Tex.App. 2004) ("permission [would be] based on an inference, and, as such, seems to conflict with the TCPA's requirement that the invitation or permission be express"), *rev'd on other grounds*, 184 S.W.3d 707 (Tex.2006); *see also Leckler v. CashCall, Inc.*, 554 F.Supp.2d 1025, 1029 (N.D.Cal.2008) (construction is mani-

festly contrary to statute because it amends "prior express" to "prior express *or implied*"), *vacated on other grounds*, 2008 WL 5000528 (N.D.Cal. Nov.21, 2008).

8. While *Rudgayzer* instructs that whether a fax constitutes an unsolicited advertisement depends on "such factors as who the sender is, as well as his motives, purposes and intentions for sending the fax," the court never held that the sender must intend to solicit the specific recipient of the fax. 779 N.Y.S.2d at 885–86. In *Stern*, unsolicited faxes were defined broadly as those that "have the effect and purpose of advertising, either directly or indirectly." 47 A.D.3d at 578, 850 N.Y.S.2d 90. Again, the court did not conclude that the sender's intent as to who he was soliciting was material.

to advertise the availability and quality of Carnival's services, and whether Carnival intended to solicit Gottlieb or a third party consumer is immaterial.

In the context of this case, the argument that Carnival did not intend to encourage Gottlieb to take one of its cruises and therefore did not violate the statute is one that surely must be made with tongue in cheek. In all other aspects, it is frivolous and specious.

### c. Purpose of the TCPA

■ Carnival argues that "the principal purpose underlying the [TCPA] was to protect the privacy of consumers, in particular residential telephone subscribers, by prohibiting unsolicited 'telemarketing' calls and faxes intended to sell products *to the consumer recipients,*" Def. Mem. at 7 (citing S.Rep. No. 102–178, 1991 U.S.C.C.A.N. 1968) (emphasis in the original), and thus this action, in which one business brings an action against another for faxes pertaining to their relationship, does not "remotely implicate" the privacy interests that Congress was interested in protecting. *Id.* Carnival's assessment of the principal purpose of the statute does not, however, coincide with that of the legislature. Senate Report 178 notes that both "residential and business [telephone] subscribers believe [telemarketer] calls are an impediment to interstate commerce" and that "the bill would ... ban *all* unsolicited advertisements sent by fax machine, unless the recipient invites or gives permission to receive such advertisements." S.Rep. No. 102–178, at 2, 6, 1991 U.S.C.C.A.N. 1968, at 1969, 1974 (emphasis added). Additionally, the TCPA declares that "the use of the telephone to market goods and services to the home and other businesses is now pervasive ... over 30,000 businesses actively telemarket goods and services to business and residential customers."

Pub.L. 102–243, 105 Stat 2394. Congress intended to protect businesses as well as private consumers and that intention is clearly manifested in the TCPA's broad language and legislative history.

### d. Statute of Limitations

■ Carnival argues that the relevant statute of limitations for Gottlieb's claims should be one year pursuant to the New York limitations period for the tort of invasion of privacy. Def. Mem. at 23 n. 16. Federal statutes enacted after December 1, 1990, that do not contain statutes of limitations are subject to 28 U.S.C. § 1658 which provides for a general limitations period of four years. This statute is as clear as it can be: "Absent an express statute of limitations, or a clear direction to consult state law, § 1658 controls," *Benedia v. Super Fair Cellular, Inc.,* No. 07 Civ. 01390(JFG), 2007 WL 2903175, at *2 (N.D.Ill. Sept. 26, 2007); *see also Stern,* 47 A.D.3d at 581–82, 850 N.Y.S.2d 90, and it does so here.

### e. Conclusion on the TCPA claim

There is no genuine dispute that the defendant transmitted unsolicited fax advertisements to the plaintiff without his express permission or invitation. The defendant's arguments, including the contention that the faxes were not unsolicited advertisements because the parties had an EBR, have been considered and are rejected. The plaintiff's motion for summary judgment is therefore granted as to the claim under the TCPA, and the defendant's cross-motion for summary judgment is denied.

### 6. Pendant state law claim

"It is well settled that where ... the federal claims are eliminated in the early stages of litigation, courts generally decline to exercise pendent jurisdiction over

remaining state law claims." *Klein & Co. Futures, Inc. v. Board of Trade of City of New York*, 464 F.3d 255, 262 (2d Cir.2006). When "resolving the state law claim[s] would entail resolving additional issues of fact, [dismissing] those claims after the federal claims had been dismissed [is] particularly appropriate." *New York Mercantile Exchange, Inc. v. IntercontinentalExchange, Inc.*, 497 F.3d 109, 119 (2d Cir. 2007) (internal citation omitted). The Court has disposed of the plaintiff's federal claim, and the pendent state claim requires resolving many additional questions of fact.[9] Accordingly, the Court declines to exercise jurisdiction over the plaintiff's pendent state law claim, and it is dismissed without prejudice.

## CONCLUSION

The plaintiff's motion for summary judgment on the TCPA claim is GRANTED, and the defendant's cross-motion for summary judgment is DENIED. The defendant is hereby ENJOINED from sending the plaintiff any further unsolicited fax advertisements. The action is referred to the Magistrate Judge to Report and Recommend on the issue of damages. The state law cause of action is dismissed.

SO ORDERED.

---

**9.** *See* N.Y. Gen. Bus. Law § 396–aa (1989), which states: "It shall be unlawful for a ... corporation ... to initiate the unsolicited transmission of telefacsimile messages promoting goods or services for the purchase by the recipient of such messages.... This section shall not apply to telefacsimile messages sent to a recipient with whom the initiator has had a prior contractual or business relationship nor shall it apply to transmissions not exceeding five pages received between the hours of 9:00 P.M. and 6:00 A.M. local time. Notwithstanding the above, it shall be unlawful to initiate any telefacsimile message to a recipient who has previously sent a written or telefacsimile message to the initiator clearly indicating that the recipient does not want to receive telefacsimile messages from the initiator."