[No. B203777. Second Dist., Div. Five. May 21, 2009.]

MAGAÑA CATHCART McCARTHY, Plaintiff and Appellant, v.
CB RICHARD ELLIS, INC., Defendant and Respondent.

COUNSEL

Zimmermann, Koomer, Connolly, Finkel & Gosselin and Scott Z. Zimmermann for Plaintiff and Appellant.

Bingham McCutchen, Michael A. Sherman, Scott Vick, Robert W. Peyton and John T. Thornton for Defendant and Respondent.

OPINION

**KRIEGLER, J.**—Without filing a motion for summary judgment or mandatory separate statements of undisputed facts, and for the purpose of creating appellate review of pretrial rulings, the parties to an action in a complex litigation case stipulated that the court would have granted summary judgment based upon its ruling on certain "threshold issues" in favor of defendant. The stipulation also included a dismissal, without prejudice, of class action allegations.

We disapprove of the unauthorized procedure utilized to create appellate review without compliance with the mandatory requirements of a summary judgment, and reverse. The requirements of a motion for summary judgment and the supporting separate statements of undisputed facts are expressly mandated by statute and court rules. In the absence of such documents, the stipulated judgment cannot stand. The convenience of the parties in a complex litigation case, and their desire to be spared the expense of a summary judgment motion, do not warrant deviation from the procedural requirements of summary judgment applicable to litigants who do not have the benefit of appearing in the complex litigation court. In addition, the stipulated judgment in this case violates an express agreement between the parties and the trial court that rulings on the threshold issues would not be a substitute for a motion for summary judgment that complies with the Code of Civil Procedure. We also conclude there is nothing about this action that warrants an exception to the foregoing rules promulgated by the Legislature and Judicial Council in a case which, in its current posture, involves a potential penalty of $500 and treble damages.

## PROCEDURAL HISTORY

Plaintiff and appellant Magaña Cathcart McCarthy (Magaña), as an individual law firm and on behalf of a class of others, filed a first amended complaint alleging that defendant and respondent CB Richard Ellis, Inc. (CBRE), engaged in a course of conduct sending hundreds of thousands of unsolicited faxes to persons and entities whose telephone numbers were

contained in databases maintained by CBRE. It was alleged that a fax sent to Magaña on or about June 18, 2005, was representative of the faxes sent by CBRE. Magaña alleged CBRE's conduct violated the Telephone Consumer Protection Act of 1991 (TCPA) (47 U.S.C. § 227), as amended in 2005 by the Junk Fax Prevention Act of 2005 (JFPA). Magaña's action sought injunctive relief, statutory damages in the amount of $500 for each unsolicited fax, and treble damages as provided in the statute.

The cause of action was screened for the complex litigation court, but initially was not designated as a complex litigation case. (Super. Ct. L.A. County, Local Rules, rule 7.3(k)(2).) At a hearing on objections to the designation, counsel for Magaña orally advised the court "on information and belief" that "class members number well into the tens of thousands." Based upon that representation, the court designated the action as complex and a trial court was assigned.

With the assistance of the complex litigation court, the parties stipulated that it would be helpful to manage the litigation (see Cal. Rules of Court, rule 3.400(a)) by determination of three threshold issues: (1) the effective date of the opt-out provisions of the JFPA—either the date of enactment of the statute (July 9, 2005) or the date of the adoption of implementing regulations by the Federal Communications Commission (FCC) (Aug. 1, 2006); (2) whether the fax received by Magaña on its face complied with the opt-out notice requirements of the JFPA, including determination of issues of "materiality" and "substantial compliance" with the opt-out notice requirements; and (3) whether an express invitation or permission to send a fax may be given orally.

The parties stipulated that consideration of these issues prior to class certification was an efficient means of narrowing the litigation. In addition, "[t]he parties recognize that the Court's determination of these issues is *not meant as a substitute for any future summary adjudication motions* as to specific facts" and if any party wished to use the court's ruling on threshold issues, "an appropriate [motion] may be made in accordance with the Code of Civil Procedure and any future Case Management Orders by this Court." (Italics added.) The trial court orally stated: "This is not in lieu of a motion for summary judgment or in lieu of summary adjudication of issues."

Simultaneous briefs on the merits were filed by the parties on the threshold issues. In addition, Magaña filed a motion to strike factual assertions in

CBRE's briefs, arguing the parties had agreed to seek "a pure legal determination" of the threshold issues, but that CBRE raised multiple factual issues in its brief.[1]

The trial court resolved the threshold issues as follows: (1) the opt-out notice provisions of JFPA became effective only when the FCC promulgated regulations on August 1, 2006, and prior to that, entities with an established business relationship with fax recipients could not be held liable for failure to adhere to the opt-out notice requirements; (2) substantial compliance is a defense to a claim of failure to comply with the opt-out mechanisms of the statute; and (3) express permission to receive a fax under the JFPA need not be in writing. The court denied Magaña's motion to strike but did not consider the factual assertions of CBRE.

After the trial court's resolution of the threshold issues, Magaña petitioned for writ relief in this court, which was summarily denied. (*Magaña Cathcart McCarthy v. Superior Court* (June 20, 2007, B197675).)

After denial of the writ petition, the parties and the trial court discussed resolution of the action. The court again noted the parties' stipulation that its rulings on threshold issues would not be in lieu of a motion for summary judgment. The court suggested the issues be tendered as a demurrer or motion for judgment on the pleadings, which the court would grant. Instead, the parties entered into a stipulation for judgment.

I. *The Stipulation for Judgment*

A. *Factual Stipulations*

In a document entitled "Stipulation for Judgment," the parties stipulated to the following facts:

(1) CBRE sent a fax advertisement to Magaña on July 18, 2005, a copy of which was attached to the complaint. At that time, Magaña had an established business relationship with CBRE pursuant to the TCPA;

---

[1] Magaña complained of the following factual allegations by CBRE in the motion to strike: that the fax to Magaña was sent only nine days after passage of the JFPA; that CBRE is not a "junk faxer" but is a "legitimate" 100-year-old public company; that Magaña does not dispute the existence of an established business relationship between CBRE and all putative class members; that Magaña did not complain of the fax and waited eight months to file this action, and Magaña did not receive any additional faxes from CBRE; that a Magaña attorney (Peter Cathcart) visited CBRE's Web site using his own user profile, where he had the option of opting out of future faxes, and that Cathcart was not misled as to how to opt out of receiving faxes; and that damages, if awarded, would be extensive.

(2) On March 14, 2006, Magaña commenced this action for violation of the TCPA, as amended by the JFPA, asserting an individual claim for receipt of the fax and claims on behalf of a putative class of similarly situated fax recipients;

(3) No motion for class certification had been made and discovery had been stayed;

(4) On January 24, 2007, the trial court issued its ruling on the threshold issues and found "[a]mong other things," that the FCC regulations recognized an established business relationship exception to unsolicited faxes, applicable to the fax received by Magaña, the exception applied to both business and residential telephone subscribers, and the opt-out notice requirements of the JFPA were not in effect on the date Magaña received the fax;

(5) The trial court's order was issued pursuant to a written stipulation of the parties that the ruling would not substitute for a summary adjudication motion, and if a party wished to file a subsequent motion applying the court's ruling, it would do so in accordance with the Code of Civil Procedure. Since the court issued its ruling, Magaña has not requested leave to file an amended complaint;

(6) A petition for writ of mandate, filed by Magaña challenging the trial court's rulings, was summarily denied by the Court of Appeal;

(7) The parties "desire that the Court of Appeal review the merits of the [trial] court's January 24 Order. The parties make this Stipulation in order to put the case in a position for immediate appeal to the Court of Appeal and to minimize additional proceedings in the trial court"; and

(8) Neither Magaña nor Magaña's counsel received any consideration in connection with the stipulation, including the dismissal of the claims of the putative class.

B. *Additional Stipulations*

The parties further stipulated that if CBRE brought a motion for summary judgment on Magaña's individual claim, the trial court would grant summary judgment because the JFPA's opt-out notice requirements were not in effect on the date CBRE sent the fax, CBRE had an established business relationship with Magaña, and as a result of that relationship, Magaña is deemed to have invited or given permission to CBRE to send the fax.

Because the trial court ruled on these threshold issues, "a formal motion asserting these dispositive grounds would be time-consuming and expensive, and a waste of limited judicial resources. For purposes of entry of judgment in this case, the Court shall be deemed to have granted summary judgment [for the reasons set forth above] and on no other basis." The judgment resolves all claims in the first amended complaint between Magaña and CBRE, and if affirmed on appeal, the judgment shall be final as to all claims of Magaña as an individual.

In addition, Magaña voluntarily dismissed without prejudice all claims in the first amended complaint on behalf of the putative class. The dismissal does not prejudice the putative plaintiffs as to class certification, or CBRE's position that class certification is improper. Magaña intends to appeal the judgment dismissing its individual claim, and nothing in the stipulation "shall prejudice or moot the appeal." Detailed preservation of rights was set forth as to the putative class.

### C. *The Judgment*

The trial court entered judgment in accordance with the stipulation. Magaña appeals from the judgment.

### DISCUSSION

### I. *Issues Relating to the TCPA and the JFPA in the Trial Court*

For purposes of the proceedings in the trial court, the relevant portions of the TCPA and JFPA are the effective date of the JFPA and its regulations (either the date of enactment of the statute or the date of adoption of the FCC regulations), and whether the established business relationship exception applied at the time CBRE sent the fax to Magaña. As we do not reach the merits of the parties' contentions, only a brief summary of the legal principles is necessary.

Enacted in December 1991, the TCPA makes it unlawful to send an unsolicited advertisement to a telephone fax machine. (47 U.S.C. § 227(b)(1)(C).) An unsolicited advertisement is defined as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission." (*Id.*, § 227(a)(5); see *Kaufman v. ACS Systems, Inc.* (2003) 110 Cal.App.4th 886, 894 [2 Cal.Rptr.3d 296] (*Kaufman*).)

An individual has the right to bring a state court action for violation of the TCPA or the regulations promulgated by the FCC pursuant to the TCPA. Available remedies include recovery of actual monetary loss or recovery of $500 in damages for each violation, whichever is greater. (47 U.S.C. § 227(b)(3)(A)–(C).) Treble damages may be awarded for willful or knowing violations. (*Id.*, § 227(b)(3); see *Kaufman, supra*, 110 Cal.App.4th at p. 896.)

Congress authorized the FCC to adopt regulations to implement the TCPA. (47 U.S.C. § 227, subd. (b)(2).) Initially, the FCC interpreted the act to provide that a fax from a person or entity with an established business relationship with the recipient can be deemed to be invited or permitted by the recipient. (*Gottlieb v. Carnival Corp.* (E.D.N.Y. 2009) 595 F.Supp.2d 212, 216–217 (*Gottlieb*).) However, this interpretation was not incorporated into the FCC's final regulations implementing the TCPA in 1992. "The rules regarding fax advertisements stated simply that '[n]o person may . . . use a telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine.' " (*Gottlieb, supra*, 595 F.Supp.2d at pp. 216–217.)

In July 2003, the FCC declared it was reversing its prior determination that the existence of an established business relationship constituted express permission to send faxes to a customer. Because Congress was considering amendments to the TCPA, the FCC delayed implementation of its revised interpretation. (*Gottlieb, supra*, 595 F.Supp.2d at p. 217.)

On July 9, 2005, Congress amended the TCPA by enactment of the JFPA, which codified the existing business relationship exception for advertisements by fax. (47 U.S.C. § 227(b)(1)(C) [amended to read to make it unlawful for any person "to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement, unless—[¶] (i) the unsolicited advertisement is from a sender with an established business relationship with the recipient"]; *Gottlieb, supra*, 595 F.Supp.2d at p. 217.)

Under the JFPA, a sender of a fax advertisement is required to provide notice and contact information on the fax explaining how to opt out of future fax transmissions from the sender. (47 U.S.C. § 227(b)(2)(D).) The circumstances which comply with the opt-out provision are specified in the amended statute. (*Ibid.*)

As with the TCPA, Congress empowered the FCC to promulgate implementing regulations within 270 days after enactment of the JFPA. The regulations took effect on August 1, 2006.

## II. Failure to Comply with the Summary Judgment Law

### A. Requirement of Separate Statements of Undisputed Facts

The stipulated judgment in this action reflects that the trial court would have granted summary judgment in favor of CBRE, although no summary judgment motion was on file and the parties had stipulated that the ruling on threshold issues was not a substitute for a proper summary judgment motion. We requested the parties to address whether the procedure in the stipulated judgment conflicts with the statute and rule governing summary judgment. The parties' responses acknowledge the stipulated judgment does not comply with the summary judgment statute and court rule. We conclude the procedure impermissibly conflicts with the mandatory requirements of summary judgment, requiring reversal of the judgment.

■ Neither the parties nor the dissent cites any authority which even remotely supports deviation from mandated rules of procedure applicable to motions for summary judgment. As described in clear terms in *Monarch Healthcare v. Superior Court* (2000) 78 Cal.App.4th 1282, 1285–1286 [93 Cal.Rptr.2d 619], courts are not free to ignore the Legislature's procedural requirements for the convenience of the parties: "Notwithstanding the parties' express or tacit agreement, the court had a responsibility to act in accordance with the statutory procedures set out by the Legislature. (*People v. Mendez* (1991) 234 Cal.App.3d 1773, 1782–1783 [286 Cal.Rptr. 216] [' "waiver of procedural requirements may not be permitted when the allowance of a deviation would lead to confusion in the processing of other cases by other litigants" ']; *People v. Silva* (1981) 114 Cal.App.3d 538, 549 [170 Cal.Rptr. 713] ['Where a statute requires a court to follow a particular procedure, an act beyond those limits is in excess of the court's jurisdiction.'].) Parties cannot stipulate to circumvent a legislatively designated code section as the exclusive statutory vehicle. (*Gilberd v. AC Transit* (1995) 32 Cal.App.4th 1494, 1501 [38 Cal.Rptr.2d 626].) The court would have been derelict in its duty had it put aside its disquiet regarding 'what the code says' and allowed the litigants to freely rewrite the discovery statutes."

The parties' attempt to create appellate review, by stipulating the trial court would have granted summary judgment based upon its ruling on threshold issues, fails at the outset as there is nothing before this court that remotely complies with the requirements for summary judgment motions found in Code of Civil Procedure section 437c or rule 3.1350 of the California Rules of

Court. The parties do not dispute the complete absence of a motion for summary judgment and separate statements of undisputed facts, which are made mandatory by statute and court rules. The record presented is inadequate for the type of review of a motion for summary judgment contemplated in the law. Moreover, there is nothing about this particular action which creates a compelling argument to abandon the Code of Civil Procedure in favor of the expediency of the parties.

■ "Summary judgment, although a very useful tool in litigation, is also a drastic remedy. Because of this, it is important that all of the procedural requirements for the granting of such a motion be satisfied before the trial court grants the remedy." (*Sierra Craft, Inc. v. Magnum Enterprises, Inc.* (1998) 64 Cal.App.4th 1252, 1256 [75 Cal.Rptr.2d 681].)

■ "California's [summary judgment] procedure requires the moving party to support its motion with evidence in the relatively elaborate form of separate statements. The court is neither permitted to act sua sponte nor solely upon the basis of argument: 'In determining whether the papers show . . . there is no triable issue as to any material fact the court *shall consider all of the evidence set forth in the papers, . . . and all inferences reasonably deducible from the evidence . . . .*' ([Code Civ. Proc.,] § 437c, subd. (c), italics added.) [Code of Civil Procedure s]ection 437c also provides that 'the plaintiff . . . may not rely upon the mere allegations or denials of its pleadings to show . . . a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists . . . .' (*Id.*, subd. (o)(2).) The statute itself thus implies the corresponding need for concrete evidence from the moving party and expressly requires the moving party to supply more than the bare assertion, whether alleged in a pleading or by way of argument, that the opposing party has no evidence to support a particular claim." (*Scheiding v. Dinwiddie Construction Co.* (1999) 69 Cal.App.4th 64, 75–76 [81 Cal.Rptr.2d 360].)

"The separate statement is not merely a technical requirement, it is an indispens[a]ble part of the summary judgment or adjudication process. 'Separate statements are required not to satisfy a sadistic urge to torment lawyers, but rather to afford due process to opposing parties and to permit trial courts to expeditiously review complex motions for . . . summary judgment to determine quickly and efficiently whether material facts are disputed.' (*United Community Church v. Garcin* (1991) 231 Cal.App.3d 327, 335 [282 Cal.Rptr. 368].)" (*Whitehead v. Habig* (2008) 163 Cal.App.4th 896, 902 [77 Cal.Rptr.3d 679].)

■ " 'The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute. [Citation.]' (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493].) To that end, the rules dictating the content and format for separate statements submitted by moving and responding parties 'permit trial courts to expeditiously review complex motions for . . . summary judgment to determine quickly and efficiently whether material facts are disputed.' (*United Community Church v. Garcin*[, *supra*,] 231 Cal.App.3d [at p.] 335 . . . .)" (*Collins v. Hertz Corp.* (2006) 144 Cal.App.4th 64, 72 [50 Cal.Rptr.3d 149].) As our review on appeal is de novo, the same considerations that allow a trial court to expeditiously review a summary judgment motion are applicable to appellate review.

The goal of expeditious review of summary judgment motions "is defeated where, as here, the trial court is forced to wade through stacks of documents, the bulk of which fail to comply with the substantive requirements of [Code of Civil Procedure] section 437c, subdivision (b)(3), or the formatting requirements of [former] rule 342, in an effort to cull through the arguments and determine what evidence is admitted and what remains at issue. The realization of this goal is so important that the Legislature has determined '[f]ailure to comply with this requirement of a separate statement may constitute a sufficient ground, in the court's discretion, for granting the motion.' ([Code Civ. Proc.,] § 437c, subd. (b)(3).)" (*Collins v. Hertz Corp., supra*, 144 Cal.App.4th at pp. 72–73.)

■ The mandatory requirements for summary judgment are explicit. "A party moving for summary judgment or summary adjudication must support the motion with 'a separate statement setting forth plainly and concisely all material facts which the moving party contends are undisputed. Each of the material facts stated shall be followed by a reference to the supporting evidence.' ([Code Civ. Proc.,] § 437c, subd. (b)(1) [motion for summary judgment]; see § 437c, subd. (f)(2) [motion for summary adjudication 'shall proceed in all procedural respects as a motion for summary judgment'].) The party opposing the motion must file with the opposition papers 'a separate statement that responds to each of the material facts contended by the moving party to be undisputed, indicating whether the opposing party agrees or disagrees that those facts are undisputed. The statement also shall set forth plainly and concisely any other material facts that the opposing party contends are disputed. Each material fact contended by the opposing party to be disputed shall be followed by a reference to the supporting evidence.' ([Code Civ. Proc.,] § 437c, subd. (b)(3).)" (*Parkview Villas Assn., Inc. v. State Farm Fire & Casualty Co.* (2005) 133 Cal.App.4th 1197, 1209 [35 Cal.Rptr.3d 411], fn. omitted.)

Additional detailed procedural requirements of the moving papers and opposition are found in rule 3.1350 of the California Rules of Court. None of the procedures mandated by court rules were complied with in this case.

■ Not only was there no separate statement of undisputed facts in this case, there was no moving party, a requirement for the granting of a summary judgment. Case law is clear that a court may not grant summary judgment in favor of a party who has not filed a summary judgment motion. (*Dvorin v. Appellate Dept.* (1975) 15 Cal.3d 648, 650 [125 Cal.Rptr. 771, 542 P.2d 1363]; *Village Nurseries v. Greenbaum* (2002) 101 Cal.App.4th 26, 46–47 [123 Cal.Rptr.2d 555]; *Sierra Craft, Inc. v. Magnum Enterprises, Inc., supra,* 64 Cal.App.4th at pp. 1254–1256.)

Code of Civil Procedure section 437c and California Rules of Court, rule 3.1350 are clear and unambiguous. Summary judgment motions require separate statements of undisputed facts with appropriate citations to supporting evidence. None are present in this case. There was no basis for a stipulated judgment that the trial court would have granted summary judgment, when none of the summary judgment rules were complied with below. The parties can cite to no case which allows for such a drastic departure from the mandatory rules of summary judgment practice, and the law is to the contrary. (*Boyle v. CertainTeed Corp.* (2006) 137 Cal.App.4th 645, 655 [40 Cal.Rptr.3d 501].)

The record in this case illustrates why it is inappropriate for this court to accede to the procedure urged by the parties: there was no motion for summary judgment; there was no moving party as to the threshold issues; instead of the responsive pleadings required by law, the parties filed simultaneous opening and reply briefs; and the formatting of the briefs in no way complied with the requirements for summary judgment.

The simultaneous briefing in the trial court does not lend itself to the expeditious review contemplated by the standard summary judgment motion. Briefing in the trial court on the threshold issues included a 25-page opening brief by Magaña on one issue with 123 pages of attachments and 259 pages of federal and out-of-state authorities. Magaña filed a 16-page opening brief on a second issue, along with 144 pages of federal cases. Magaña filed a document conceding a third issue.

CBRE filed a 29-page opening brief on two issues, supported by an appendix of authorities consisting of 390 pages. CBRE then filed a corrected opening brief of 29 pages.

Magaña filed objections to CBRE's factual assertions and a motion to strike. Magaña filed a 37-page reply brief on one issue and a 26-page reply brief on a second issue. Attachments of 61 pages were filed with Magaña's reply briefs along with an additional 339 pages of federal and out-of-state authorities. CBRE filed a 16-page reply brief.

The record pertaining to the threshold issues fails to provide this court with the expeditious means of ruling on a summary judgment motion. To the contrary, it is comprised of simultaneously filed opening and reply briefs, along with over 1,000 pages of attachments and citations to federal and out-of-state authorities. This record is inadequate for review on the basis the trial court would have granted summary judgment.

### B. *The Exception to the Rule Against Appeal from a Consent Judgment*

The parties rely on an inapposite line of cases which recognizes that an appellate court may review a stipulated judgment in order to obtain appellate review of a dispositive ruling. Typical of these authorities is *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 400 [87 Cal.Rptr.2d 453, 981 P.2d 79] (*Norgart*), which permitted an appeal from a judgment entered by agreement of the parties, which would otherwise lack appellate jurisdiction under the rule prohibiting an appeal from a "consent judgment"—"a judgment entered by a court under the authority of, and in accordance with, the contractual agreement of the parties [citation] . . . ." While normally a party may not appeal from a consent judgment, there is "at least one 'exception,' namely, that '[i]f consent was merely given to facilitate an appeal following adverse determination of a critical issue, the party will not lose his right to be heard on appeal.' [Citation.]" (*Ibid.*) Where the intent of the parties is not merely to settle their dispute, but to "hasten its transfer from the trial court to the appellate court," the consent judgment rule does not bar appellate jurisdiction. (*Id.* at p. 401.)

However, examination of the cases typified by *Norgart* reveals in each instance there was a proper summary judgment motion for review. In *Norgart*, the defendant filed two motions for summary judgment. The parties agreed that the court would grant summary judgment on the basis of a statute of limitations defense (although the tentative ruling was to deny summary judgment) and enter judgment accordingly, in order to obtain appellate review of the issue. (*Norgart, supra*, 21 Cal.4th at pp. 393–394.) Our Supreme Court determined that the parties' intent was to bring the issue immediately to the attention of the appellate court. (*Id.* at pp. 401–403.) With this procedural history, the court determined the merits of the duly filed motions for summary judgment. (*Id.* at pp. 404–410.)

Other authorities are in accord in allowing appellate review of a stipulated judgment where the intent of the parties is not to resolve the action by stipulation, but instead to obtain appellate review of a dispositive adverse ruling. However, unlike the instant case, the appeals in these actions all followed a dispositive ruling *on a properly litigated motion for summary judgment.* (*Building Industry Assn. v. City of Camarillo* (1986) 41 Cal.3d 810, 815–817 [226 Cal.Rptr. 81, 718 P.2d 68] ["partial summary judgment" in favor of defendant was effectively dispositive of the action; a stipulated judgment to allow plaintiff to obtain review of the merits of summary judgment was not barred by the rule against appeal from consent judgments]; *Chavez v. Carpenter* (2001) 91 Cal.App.4th 1433, 1437 [111 Cal.Rptr.2d 534] [defendant's summary adjudication motion granted and plaintiff dismissed remaining claims; intent was to obtain appellate review rather than settle the action]; *Aloha Pacific, Inc. v. California Ins. Guarantee Assn.* (2000) 79 Cal.App.4th 297, 306 [93 Cal.Rptr.2d 148] [plaintiff's motion for summary judgment denied and parties stipulated to judgment for defendant; appeal proper because consent given to facilitate an appeal]; *Holmes v. Roth* (1992) 11 Cal.App.4th 931, 934, fn. 1 [14 Cal.Rptr.2d 315] [after defendant's summary judgment motion was denied, parties stipulated to judgment against defendant; rule against appeal from consent judgment inapplicable].)

■ Accordingly, the issue is not whether parties may stipulate to a judgment in order to secure appellate review. The above cited authorities clearly permit the practice. However, there must be a properly filed motion for the appellate court to review. We simply cannot review the merits of a motion that was never made and which is in direct contravention of the mandated rules of procedure. The stipulated judgment providing the trial court would have granted summary judgment, had one been made, must be reversed.

### C. *Other Considerations*

The parties contend we should reach the merits of the judgment because to require them to comply with the summary judgment procedure would have been time consuming, expensive, and wasteful of judicial resources. The contention is without merit for multiple reasons.

■ First, and most obviously, the Legislature has determined the procedure for summary judgment. It is not the place of the parties, even if assigned to the complex litigation court, to rewrite the Code of Civil Procedure for their own convenience and economic interests. The summary judgment rules apply to the complex litigation court. (*First State Ins. Co. v. Superior Court* (2000) 79 Cal.App.4th 324, 331 [94 Cal.Rptr.2d 104] [" '[Code of Civil Procedure section] 437c does not categorize summary judgment motions

depending on their difficulty and assign different timing requirements to more difficult motions' "].) The statutory procedure for summary judgment may not be altered by local rule or general orders of the trial court. (*Boyle v. CertainTeed Corp., supra*, 137 Cal.App.4th at pp. 651–655 [statutory requirements for summary judgment may not be altered in asbestos actions by order of the trial court].) Complex litigation cases cannot be moved to the front of the line in the appellate courts by circumventing the law of summary judgment by stipulation.

Second, there is nothing about this action that compels disregard of the rules of civil procedure. To the contrary, in its present posture the value of this case involves one alleged violation of the JFPA, which carries with it a $500 penalty with the possibility of treble damages.

■ Third, while the issue presented is an interesting one, it is no more challenging than the issues this court considers on a regular basis from the general jurisdiction civil courts, whose litigants are required to fully comply with the requirements of Code of Civil Procedure section 437c and California Rules of Court, rule 3.1350. The circumstance that the superior court deemed the action complex on the basis of an oral "information and belief" representation of the potential size of the class, with no documentary showing to support the assertion, does not mean the parties were thereafter excused from compliance with the rules applicable to other civil litigants. No doubt, the complex litigation courts have broad authority to manage cases, as a complex case is defined as one "that requires exceptional judicial management." (Cal. Rules of Court, rule 3.400.) But when it comes to the requirements for summary judgment, the Legislature and the Judicial Council determine the procedure to be followed.

Fourth, there was an express agreement between the trial court and the parties that any ruling on the threshold issues would not be used for purposes of summary judgment or summary adjudication. The parties stipulated to this in writing, and the court at least twice orally stated on the record that its rulings were not a substitute for a proper motion for summary judgment. This stipulation expressly required that if a party sought to apply the court's ruling on a threshold issue in a dispositive motion, a proper motion would be filed in compliance with the Code of Civil Procedure. The parties offer no explanation for why they should not be held to their own agreement.

■ Fifth, the parties argue that the appeal raises merely issues of law that are subject to de novo review, so this court should ignore the procedural rules of summary judgment and render an opinion based on what has been presented. It does not follow from the fact that summary judgments are reviewed de novo that the parties may stipulate that a summary judgment

would have been granted, when none has been made, and when case law, the summary judgment statute and court rule provide otherwise. In addition, it is not clear exactly how much of the more than 1,500-page record of pleadings and authorities submitted on the threshold issues the parties wish us to review in order to conduct the de novo review they desire. To the extent the parties rely on all the briefing in the trial court on the threshold issues, it bears emphasis that there are unresolved factual issues contained in CBRE's trial briefs that Magaña believed were serious enough to warrant the filing of a motion to strike. (See fn. 1, *ante*.) With these factual issues unresolved, and their materiality unsettled, this court cannot affirm a judgment speculating that the trial court would have granted summary judgment.

## DISPOSITION

The judgment is reversed, and the cause is remanded to the trial court for further proceedings consistent with the Code of Civil Procedure. The parties are to bear their own costs on appeal.

Turner, P. J., concurred.

**MOSK, J.,** Dissenting.—I dissent.

I would affirm the judgment. Under the circumstances of this case, the procedure used to enter judgment, albeit unconventional, does not prevent review of the issues on which this case can, as a matter of law, be determined. Those dispositive issues concern the operative date of an amendment to a federal statute and state court jurisdiction over a determination of the validity of an exemption to that statute. They involve matters of statutory interpretation, and the facts necessary to frame those issues on appeal are few and not disputed in any material respect. Thus, we are presented with issues of law that we review de novo.

The policies favoring judicial efficiency and the conservation of judicial resources in large, complex cases outweigh any interest that might be served by a reversal on procedural grounds for the sole purpose of requiring the parties to adhere to formal motion procedures. The issues were thoroughly briefed below and on appeal, thereby enabling us to decide them on the merits. Moreover, given the parties' stipulation agreeing to the procedure utilized by the trial court, neither party is aggrieved or in any way prejudiced by that procedure. In fact, both parties urge this court to decide the merits, which involve issues of widespread importance.

To return the matter to the trial court so that the parties can file papers seeking a judgment to which they have already stipulated is a statutorily renounced "idle act[]" and elevation of form over substance. (Civ. Code, §§ 3532, 3528; see also Civ. Code, § 3533 ["The law disregards trifles."].) The result is a vivid example of an inflexible, cumbersome judicial system that increasing numbers of commercial litigants are avoiding by choosing alternative means of dispute resolution.

Accordingly, we should hear the appeal and decide it on two of the substantive issues raised. Reaching those issues, I would hold that the effective date of the opt-out notice provisions of the Junk Fax Prevention Act of 2005 (Junk Fax Act), 47 United States Code section 227, is the date of the promulgation of the implementing regulations, rather than the earlier date of enactment. I would also hold that the federal courts of appeals have exclusive jurisdiction to determine the validity of the "established business relationship" exemption recognized under the Telephone Consumer Protection Act of 1991 (Original Act), 47 United States Code former section 227, which was amended by the Junk Fax Act. And, because the determination of those two issues is sufficient to affirm the judgment, I would not reach the issue concerning substantial compliance with the opt-out notice provisions of the Junk Fax Act.

## CASE SUMMARY

Plaintiff and appellant Magaña Cathcart McCarthy (plaintiff) received an unsolicited facsimile advertisement (the fax ad) from defendant CB Richard Ellis, Inc. (defendant), after the enactment of the Junk Fax Act, but before the promulgation of the implementing regulations. In response, plaintiff filed a class action for violation of the Original Act as amended by the Junk Fax Act. Plaintiff alleged that, regardless of any established business relationship between plaintiff and defendant, the fax ad failed to comply with the opt-out notice requirements of the Junk Fax Act. Plaintiff also contended that even if the Junk Fax Act was not operative at the time defendant sent the fax ad, there was no established business relationship exemption under the Original Act. Early in the litigation, the trial court rendered decisions adverse to plaintiff on certain legal issues identified by the parties. Among other things, the trial court decided that plaintiff's claim based on the fax ad did not violate any law because the Junk Fax Act was not operative at the time defendant sent the fax ad. The trial court then entered judgment in favor of defendant based on the stipulation of the parties that the decision of the trial court be treated as an order granting summary judgment.

On appeal, plaintiff argues that the trial court erred in holding that the opt-out notice provisions of the Junk Fax Act were not effective until the promulgation of the implementing regulations, instead of on the date of enactment over a year earlier. Plaintiff further contends that even assuming the Junk Fax Act was effective only after implementing regulations were promulgated, there was no "established business relationship" defense available to defendant under the Original Act because the Federal Communications Commission's (FCC) long-standing recognition of such a defense was contrary to the express terms of the Original Act and therefore invalid. Plaintiff also contends that the trial court erred when it applied the common law doctrine of substantial compliance to the opt-out notice requirements of the Junk Fax Act and concluded that the fax ad substantially complied with those requirements.

## FACTS AND PROCEDURAL HISTORY

On July 18, 2005, defendant sent the fax ad to plaintiff. At the time, defendant had an established business relationship with plaintiff.

On March 16, 2006, plaintiff filed a class action against defendant. Thereafter, plaintiff filed a first amended complaint alleging a single cause of action for violation of the Original Act, as amended by the Junk Fax Act. According to plaintiff, "since July 9, 2005, [d]efendants have engaged in, and continue to engage in, a course of conduct of sending of a stream of mass transmissions of hundreds of thousands of unsolicited faxes advertising or otherwise promoting the services and products of [defendant] to persons and entities whose telephone numbers are contained in databases maintained by [d]efendants. . . . Defendants' conduct of sending unsolicited advertisements to the Plaintiff Class violates 47 U.S.C. § 227 ('the Act'), including § 227(b)(1)(C) of the Act."

Plaintiff also alleged that the established business relationship exemption codified in the Junk Fax Act was not available to defendant. According to plaintiff, because the fax ad did not contain the opt-out notice required by the Junk Fax Act, defendant could not rely on its established business relationship with plaintiff as a justification for sending the fax. Plaintiff sought injunctive relief prohibiting further violations of the Junk Fax Act, actual damages, or a minimum of $500 in statutory damages, for each violation of the act, treble damages for willful violation of the Junk Fax Act, and attorney fees and costs.

Prior to allowing discovery or the filing of a motion for class certification, the trial court, which was part of Los Angeles County's complex litigation program, identified certain threshold legal issues, and the parties thereafter stipulated that those issues should be briefed and determined prior to further proceedings.[1] The first two issues identified by the trial court were: "Can a [Junk Fax Act] claim be asserted for an alleged violation of [the Junk Fax Act's] opt-out notice requirements with respect to a fax that was sent on or after the effective date of the statute (July 9, 2005), but before the effective date of the FCC's regulations (August 1, 2006)?" and "Does the [fax ad] on its face comply or not comply with the opt-out notice requirements of [the Junk Fax Act]? In determining this issue, the Court is to decide whether 'materiality' is an element of the offense and whether 'substantial compliance' with the opt-out notice requirements is a defense to a claim for alleged violation of [the Junk Fax Act's] opt-out notice requirements."

After the parties briefed the issues, the trial court held a hearing and ruled as follows: "[U]nder the language of the statute (and for purposes of the instant motion), the opt-out notice provisions under § 227(b)(1)(C)(iii) (and § 227(b)(2)(D)) became effective only when the FCC promulgated regulations meeting the requirements of those subdivisions. . . . In the interim period (through the effective date of the FCC regulations on August 1, 2006), entities with an established business relationship with fax recipients could not be held liable under [the Junk Fax Act] for failure to adhere to the opt-out notice requirements." Although the trial court did not have to reach the substantial compliance issue, it nevertheless ruled that the "intent of [the Junk Fax Act] to provide some notice of the right to opt-out (and the cost-free mechanisms for doing so) may be satisfied by substantial compliance with the statute."

Based on the trial court's rulings, the parties entered into a stipulation for judgment, conceding that the trial court would grant a motion for summary judgment in favor of defendant based on the court's legal rulings. The trial court entered judgment on the stipulation, and this appeal followed. After briefing and oral argument, this court requested letter briefs on whether the procedures employed in the trial court were such that it could render an appropriate and appealable summary judgment. Both parties contended in their letter briefs that the judgment was appropriately entered and appealable, and that this court should decide the merits of the issues tendered on appeal.

---

[1] The parties' stipulation included a recital that the determination of the threshold issues would not be in lieu of summary judgment motions. Nevertheless, in the subsequent stipulation for entry of judgment, the parties provided that the stipulation was in lieu of a formal summary judgment.

## DISCUSSION

### A. *Appropriate and Reviewable Judgment*

The parties stipulated to a judgment based on a pronouncement of the law by the trial court that followed legal briefing and argument by the parties. The procedure used, which did not include a demurrer, summary judgment motion, or other dispositive statutory motion, was justified as being a case management tool under the complex litigation program of the Los Angeles County Superior Court (Super. Ct. L.A. County, Local Rules, rules 7.3(h), 7.6; see Cal. Rules of Court, rules 3.400 et seq., 3.750 et seq.; Gov. Code, § 68612; Code Civ. Proc., § 575.1).

Although trial courts in complex cases have broad discretion to manage those cases in a manner that promotes efficiency and the conservation of judicial resources (see, e.g., Cal. Rules of Court, rules 3.400 et seq., 3.750 et seq.), that discretion is limited by countervailing interests of litigants and the public. "Reviewing courts have not hesitated to strike down local court rules or policies on the ground they are inconsistent with statute . . . . [¶] A common theme in the appellate decisions invalidating local rules . . . is that a local court has advanced the goals of efficiency and conservation of judicial resources by adopting procedures that deviated from those established by statute, thereby impairing the countervailing interests of litigants as well as the interest of the public in being afforded access to justice, resolution of a controversy on the merits, and a fair proceeding." (*Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1352–1353 [63 Cal.Rptr.3d 483, 163 P.3d 160].) Deviation from formal procedures may, in many instances, present on appeal a case without an adequate record. Therefore, statutory procedures, such as those governing summary judgment, are designed, inter alia, to provide the appellate court with a factual and analytical framework upon which there can be de novo review.

It is important to recognize that the trial court did not, in effect, depart from established summary judgment procedures because the parties entered into a stipulation[2] in connection with those procedures; "[s]tipulations may be entered into concerning any step of an action . . . ." (*Barendregt v. Downing,*

---

[2] " 'The term "stipulation" as used in practice means an agreement entered into by attorneys in the form required by law, relating to some matter incidental to an action or proceeding. Such a stipulation . . . when made in open court . . . constitutes not only an agreement between the parties, but also one between them and the court, which the court is bound to enforce for the benefit of those interested and for the protection of its own honor and dignity.' (46 Cal.Jur.2d (Stipulations) § 2.) [¶] Stipulations may be entered into concerning any step of an action (Code Civ. Proc., § 283), including the entry of judgment (*Church v. Church* [(1940)] 40 Cal.App.2d 701 [105 P.2d 643]), modification of a judgment (*Putnam v. Cameron* [(1954)] 129 Cal.App.2d

*supra*, 175 Cal.App.2d at p. 736.) Moreover, the court did not dispense with any procedure over the objection and to the prejudice of one of the parties. Here, *both parties agreed* to the procedure employed by the trial court to determine the legal issues, *stipulated* to the entry of judgment as if it were based on an order granting summary judgment, and *agreed* that the ensuing judgment was appealable.[3]

The briefing and stipulation in the trial court present an adequate record for review of the trial court's determination of the effective date of the Junk Fax Act and its jurisdiction to determine the validity of FCC orders. The effective date issue is adequately framed by the undisputed facts: nine days after the Junk Fax Act was signed into law, defendant sent the unsolicited fax ad to plaintiff without first obtaining express permission from plaintiff to send the ad; defendant and plaintiff had an established business relationship prior to the transmission of the fax ad; the Junk Fax Act was signed into law on July 9, 2005; and the implementing regulations were issued by the FCC on August 1, 2006. Thus, the effective date issue, which turns on statutory construction and an analysis of legislative history, can be decided on the record before us, without a formal motion or separate statements. And our jurisdiction to rule on the validity of the FCC's recognition of the established business relationship exemption is a question of law that also can be decided on the present record.

Neither party claims to be aggrieved by the procedure to which they stipulated, nor does either party claim that it was prejudiced by that procedure.[4] It has long been recognized that when the parties consent to a judgment to facilitate an appeal of a trial court ruling on a critical issue, the

---

89 [276 P.2d 102]), or for retrial of a partially tried cause (*City of Los Angeles v. Cole* [(1946)] 28 Cal.2d 509 [170 P.2d 928])." (*Barendregt v. Downing* (1959) 175 Cal.App.2d 733, 735–736 [346 P.2d 870].)

[3] Although the court in *Monarch Healthcare v. Superior Court* (2000) 78 Cal.App.4th 1282 [93 Cal.Rptr.2d 619] unequivocally declared at page 1286 that "[p]arties cannot stipulate to circumvent a legislatively designated code section as the exclusive statutory vehicle," the case that *Monarch* cites for that proposition, *Gilberd v. AC Transit* (1995) 32 Cal.App.4th 1494, 1501 [38 Cal.Rptr.2d 626], does not support it. *Gilberd*, which involved a trial court's jurisdiction to reconsider a prior order, did not even involve a stipulation by the parties, much less one to circumvent jurisdictional requirements.

[4] The general rule in class action procedure is that the trial court should decide whether to certify a class prior to making any determinations on the merits. (*Fireside Bank v. Superior Court* (2007) 40 Cal.4th 1069, 1074 [56 Cal.Rptr.3d 861, 155 P.3d 268].) But that rule does not apply in cases, such as this one, in which the defendant seeks or agrees to a determination on the merits prior to a class being certified. (*Id.* at p. 1083 ["If [a defendant] fails to timely object, or affirmatively seeks resolution of the merits before certification, [the defendant] will be deemed to have waived its rights [to have a class certified prior to merits determinations]."].)

resulting judgment is reviewable on appeal.[5] "In *Connolly* v. *County of Orange* (1992) 1 Cal.4th 1105 [4 Cal.Rptr.2d 857, 824 P.2d 663], we, in part, paraphrased and, in part, quoted *Building Industry Assn.* [*v. City of Camarillo* (1986) 41 Cal.3d 810 [226 Cal.Rptr. 81, 718 P.2d 68]]: 'Although a consent . . . judgment is not normally appealable, an exception is recognized when "consent was merely given to facilitate an appeal following adverse determination of a critical issue." ' (*Connolly* v. *County of Orange, supra,* 1 Cal.4th at p. 1111.) For, in the words of *Building Industry Assn.* itself, 'it is "wasteful of trial court time" to require the plaintiff to undergo a probably unsuccessful . . . trial merely to obtain an appealable judgment.' (*Building Industry Assn.* v. *City of Camarillo, supra,* 41 Cal.3d at p. 817.)" (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 400 [87 Cal.Rptr.2d 453, 981 P.2d 79].)

Under the specific facts of this case, the procedure utilized to enter judgment was efficient and avoided an unnecessary consumption of judicial resources. This was consistent with the trial court's " 'inherent equity, supervisory and administrative powers, as well as inherent power to control litigation and conserve judicial resources.' (*Lucas v. County of Los Angeles* (1996) 47 Cal.App.4th 277, 284 [54 Cal.Rptr.2d 655]; accord, *Amtower v. Photon Dynamics, Inc.* [(2008)] 158 Cal.App.4th [1582,] 1595 [71 Cal.Rptr.3d 361].)" (*K.C. Multimedia, Inc. v. Bank of America Technology & Operations, Inc.* (2009) 171 Cal.App.4th 939, 951 [90 Cal.Rptr.3d 247]; see also *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 967 [67 Cal.Rptr.2d 16, 941 P.2d 1203] ["It is also well established that courts have fundamental inherent equity, supervisory, and administrative powers, as well as inherent power to control litigation before them."].)

Thus, the lack of a formal motion in this instance should not prevent appellate review. (See *Aloha Pacific, Inc. v. California Ins. Guarantee Assn.* (2000) 79 Cal.App.4th 297, 306, fn. 6 [93 Cal.Rptr.2d 148] [parties stipulated to judgment in favor of defendant after plaintiff's summary judgment motion was denied; appeal allowed even though defendant did not file its own summary judgment motion]; *Holmes v. Roth* (1992) 11 Cal.App.4th 931, 934, fn. 1 [14 Cal.Rptr.2d 315] [parties stipulated to judgment in favor of plaintiff after defendant's motion for summary judgment denied; appeal allowed even though plaintiff did not file a summary judgment motion].) As *Aloha Pacific* and *Holmes* illustrate, parties can stipulate to a judgment that is reviewable on appeal even though the party in whose favor judgment is entered did not file a summary judgment motion. Fairly read, these cases support the

---

[5] Cf. *Cable Connection, Inc. v. DIRECTV, Inc.* (2008) 44 Cal.4th 1334 [82 Cal.Rptr.3d 229, 190 P.3d 586], in which the California Supreme Court recognized the ability of parties to an arbitration agreement to alter the general rule that arbitration awards are not reviewable on the merits by expressly agreeing that an arbitrator's award may be reviewed for legal error. (*Id.* at pp. 1340, 1362.)

proposition that a formal summary judgment motion is not necessarily required when parties stipulate to a judgment to facilitate an appeal on a dispositive issue.

A reversal of the judgment on procedural grounds will simply result in unnecessary, further proceedings in the trial court. Defendant will have to file a motion, with a separate statement. Plaintiff will file a response, with a separate statement. The trial court will then be faced with the same legal issue it already decided. Plaintiff will appeal, and we will be in the same position we are now, but only after an undue consumption of judicial and party resources. For these reasons, I would not reverse the judgment for failure to follow certain procedures that the parties have stipulated should be deemed followed. (See *Amtower v. Photon Dynamics, Inc., supra,* 158 Cal.App.4th at p. 1588 [criticizing the use of motions in limine as a substitute for summary judgment and other dispositive motions, but holding that the use of that unorthodox practice in that case did not warrant reversal].)

I do not advocate procedural anarchy. As a general practice, the trial courts should adhere to statutory procedures to avoid the problems identified in the majority opinion, but which are not applicable here. (*Amtower v. Photon Dynamics, Inc., supra,* 158 Cal.App.4th at p. 1588 ["The better practice in nearly every case is to afford the litigant the protections provided by trial or by the statutory processes."].) Under the circumstances of this case and the stipulation of the parties, however, the countervailing interests of litigants and the public in being afforded access to justice, obtaining decisions on the merits, and ensuring fair proceedings would not be served by a reversal. On the other hand, a reversal will frustrate the legitimate interests of the trial court in promoting efficiency and avoiding undue consumption of judicial resources.

### B. *Standard of Review*

Plaintiff's contention that the trial court erroneously determined the effective date of the Junk Fax Act requires the court to construe the relevant provisions of that act. Issues of statutory construction are reviewed de novo on appeal. (*Barner v. Leeds* (2000) 24 Cal.4th 676, 683 [102 Cal.Rptr.2d 97, 13 P.3d 704] ["We . . . conduct de novo review of the trial court's resolution of the underlying issues of statutory construction."]; see also *U.S. v. Cabaccang* (9th Cir. 2003) 332 F.3d 622, 624–625 ["The construction or interpretation of a statute is a question of law that we review de novo."].) Similarly, the question of subject matter jurisdiction under the Hobbs Act[6] is reviewed de novo. (*Rural Iowa Independent Telephone Assn. v. Iowa Utilities*

---

[6] 28 United States Code section 2342.

*Bd.* (8th Cir. 2004) 362 F.3d 1027, 1030; *Carpenter v. Department of Transp.* (9th Cir. 1994) 13 F.3d 313, 314.)

### C. *Statutory and Regulatory Background*

#### 1. *The Original Act*

On December 20, 1991, Congress enacted the Original Act. (47 U.S.C. § 227.) That act, prior to amendments, prohibited, inter alia, the use of any telephone facsimile machine, computer, or other device to send an "unsolicited advertisement" to a telephone facsimile machine. (47 U.S.C. § 227(b)(1)(C).) The Original Act defined an unsolicited advertisement as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission." (47 U.S.C. former § 227(a)(4).) Although the Original Act expressly recognized an exemption from the prohibition on "telephone solicitation" based on an established business relationship between the parties, it did not expressly exempt senders of unsolicited facsimile advertisements on that basis. (See 47 U.S.C. former § 227(a)(3).)

#### 2. *Established Business Relationship Exemption for Unsolicited Facsimile Advertisements*

In 1992, the FCC adopted rules implementing the Original Act. (*Rules and Regs. Implementing the Telephone Consumer Protection Act of 1991*, Report and Order (1992) 7 F.C.C.R. 8752; see also 47 C.F.R. § 64.1200 (2008).) In a footnote to the Report and Order for those rules, the FCC explained that "[i]n banning telephone facsimile advertisements, the [Original Act] leaves the Commission without discretion to create exemptions from or limit the effects of the prohibition . . . ; thus, such transmissions are banned in our rules as they are in the [Original Act]. [Citation.] We note, however, that facsimile transmission [*sic*] from persons or entities who have an established business relationship with the recipient can be deemed to be invited or permitted by the recipient." (Report and Order, *supra*, 7 F.C.C.R. at p. 8779, fn. 87, citation omitted.) The FCC defined an "established business relationship" in the context of a telephone solicitation as "a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of an inquiry, application, purchase or transaction by the residential subscriber regarding products or services offered by such person or entity, which relationship has not been previously terminated by either party." (*Id.* at p. 8793.)

Over a decade later, on July 3, 2003, the FCC updated its telemarketing and facsimile advertising rules. (*Rules and Regs. Implementing the Telephone*

*Consumer Protection Act of 1991* (2003) 18 F.C.C.R. 14014–14178.) The updated rules purported to reverse the FCC's prior determination that an established business relationship with the recipient of a facsimile advertisement would be deemed express permission to send the advertisement. (*Id.* at pp. 14127–14128.) "We now reverse our prior conclusion that an established business relationship provides companies with the necessary express permission to send faxes to their customers. As of the effective date of these rules, the [existence of an established business relationship] will no longer be sufficient to show that an individual or business has given their express permission to receive unsolicited facsimile advertisements." (*Ibid.*) Instead, the FCC determined that recipients must give express permission in a signed writing to receive facsimile advertisements. (*Id.* at p. 14128.)

On August 18, 2003, however, the FCC issued an order on reconsideration that extended until January 1, 2005, the effective date of the FCC's "determination that an established business relationship will no longer be sufficient to show that an individual or business has given express permission to receive unsolicited facsimile advertisements." (*Rules and Regs. Implementing the Telephone Consumer Protection Act of 1991*, Order on Reconsideration (2003) 18 F.C.C.R. 16972, ¶ 1.) Therefore, according to the FCC, "until the amended rule . . . becomes effective on January 1, 2005, *an established business relationship will continue to be sufficient to show that an individual or business has given express permission to receive facsimile advertisements.*" (*Id.* at p. 16975, ¶ 6, italics added.) On September 15, 2004, the FCC, in response to a petition, again delayed the implementation of its determination reversing the established business relationship exemption from the prohibition on unsolicited facsimile advertisements. The new effective date was June 30, 2005. (47 C.F.R. § 64.1200(a)(3)(i) (2008).)

On June 27, 2005, while Congress was considering enactment of the Junk Fax Act, the FCC again delayed the effective date of the proposed rule reversing the established business relationship exemption: "[W]e . . . delay, until January 9, 2006, the effective date of the determination that an established business relationship will no longer be sufficient to show that an individual or business has given express permission to receive unsolicited facsimile advertisements . . . ." (Rules and Regs. Implementing the Telephone Consumer Protection Act of 1991, Order, 70 Fed.Reg. 37705 (June 30, 2005).)

### 3. *The Junk Fax Act*

The President signed the Junk Fax Act into law on July 9, 2005. As relevant to this case, it amended the Original Act as follows:

1. It codified the established business relationship exemption from the prohibition on unsolicited facsimile advertisements (47 U.S.C. § 227(b)(1)(C)(i));

2. It provided a definition of an established business relationship in the context of unsolicited facsimile advertisements (47 U.S.C. § 227(a)(2)(A));

3. It required the sender of a facsimile advertisement to provide a specified notice and contact information on the facsimile to allow recipients to "opt out" from any future facsimile transmissions from the sender (47 U.S.C. § 227(b)(2)(D)); and

4. It specified the circumstances under which a request to "opt out" complied with the act. (47 U.S.C. § 227(b)(2)(D).)

The Junk Fax Act contained the following provisions relevant to the effective date issue:

"(b) Restrictions on use of automated telephone equipment.

"(1) Prohibitions. It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—[¶] . . . [¶]

"(C) to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement, unless—

"(i) the unsolicited advertisement is from a sender with an established business relationship with the recipient;

"(ii) the sender obtained the number of the telephone facsimile machine through—

"(I) the voluntary communication of such number, within the context of such established business relationship, from the recipient of the unsolicited advertisement, or

"(II) a directory, advertisement, or site on the Internet to which the recipient voluntarily agreed to make available its facsimile number for public distribution, except that this clause shall not apply in the case of an unsolicited advertisement that is sent based on an established business relationship with the recipient that was in existence before [the date the Junk Fax Act was enacted] [July 9, 2005] if the sender possessed the facsimile machine number of the recipient before such date of enactment; and

"(iii) the unsolicited advertisement contains a notice meeting the requirements under paragraph (2)(D), except that the exception under clauses (i) and (ii) shall not apply with respect to an unsolicited advertisement sent to a telephone facsimile machine by a sender to whom a request has been made not to send future unsolicited advertisements to such telephone facsimile machine that complies with the requirements under paragraph (2)(E); or [¶] . . . [¶]

"(2) Regulations; exemptions and other provisions. The Commission shall prescribe regulations to implement the requirements of this subsection. In implementing the requirements of this subsection, the Commission [¶] . . . [¶]

"(D) shall provide that a notice contained in an unsolicited advertisement complies with the requirements under this subparagraph only if—

"(i) the notice is clear and conspicuous and on the first page of the unsolicited advertisement;

"(ii) the notice states that the recipient may make a request to the sender of the unsolicited advertisement not to send any future unsolicited advertisements to a telephone facsimile machine or machines and that failure to comply, within the shortest reasonable time, as determined by the Commission, with such a request meeting the requirements under subparagraph (E) is unlawful;

"(iii) the notice sets forth the requirements for a request under subparagraph (E);

"(iv) the notice includes—

"(I) a domestic contact telephone and facsimile machine number for the recipient to transmit such a request to the sender; and

"(II) a cost-free mechanism for a recipient to transmit a request pursuant to such notice to the sender of the unsolicited advertisement; the Commission shall by rule require the sender to provide such a mechanism and may, in the discretion of the Commission and subject to such conditions as the Commission may prescribe, exempt certain classes of small business senders, but only if the Commission determines that the costs to such class are unduly burdensome given the revenues generated by such small businesses;

"(v) the telephone and facsimile machine numbers and the cost-free mechanism set forth pursuant to clause (iv) permit an individual or business to make such a request at any time on any day of the week; and

"(vi) the notice complies with the requirements of subsection (d) . . . ."[7] (47 U.S.C. § 227(b)(1), (2).)

### D. *Effective Date of the Junk Fax Act Opt-out Notice Provision*

Plaintiff's primary contention on appeal is that the Junk Fax Act became effective, and therefore enforceable against defendant, the day it was signed into law—July 9, 2005—rather than on the day the regulations promulgated under that act became effective—August 1, 2006. According to plaintiff, Congress did not expressly state in the Junk Fax Act that it, or any provision of it, would become effective only after implementing regulations were promulgated and adopted. Plaintiff argues that, as a result, the opt-out notice requirements of the Junk Fax Act became effective immediately upon its passage. Thus, plaintiff concludes that the fax ad violated the Junk Fax Act by not including the required opt-out notice.

In construing the Junk Fax Act, the court should "apply well-settled principles of statutory construction. [The] task is to discern the Legislature's intent. The statutory language itself is the most reliable indicator, so [the court] start[s] with the statute's words, assigning them their usual and ordinary meanings, and construing them in context. If the words themselves are not ambiguous, [the court] presume[s] the Legislature meant what it said, and the statute's plain meaning governs. On the other hand, if the language allows more than one reasonable construction, [the court] may look to such aids as the legislative history of the measure and maxims of statutory construction. In cases of uncertain meaning, [the court] may also consider the consequences of a particular interpretation, including its impact on public policy. (E.g., *MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.* (2005) 36 Cal.4th 412, 426 [30 Cal.Rptr.3d 755, 115 P.3d 41]; *People v. Smith* (2004) 32 Cal.4th 792, 797–798 [11 Cal.Rptr.3d 290, 86 P.3d 348].)" (*Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1190 [48 Cal.Rptr.3d 108, 141 P.3d 225]; see also *Schatz v. Allen Matkins Leck Gamble & Mallory LLP* (2009) 45 Cal.4th 557, 571 [87 Cal.Rptr.3d 700, 198 P.3d 1109].)

Although, as a general rule, statutes are considered effective on the date of their enactment, there is a recognized exception to that rule when Congress gives clear direction that a statute will not become effective immediately. As

---

[7] The "Historical and Statutory Notes" for section 227 provide, under the heading "Regulations," as follows: "Pub. L. 109-21, Sec. 2(h), July 9, 2005, 119 Stat. 362, provided that: 'Except as provided in section 227(b)(2)(G)(ii) of the Communications Act . . . , not later than 270 days after the date of enactment of this Act [July 9, 2005], the [FCC] shall issue regulations to implement the amendments made by this section [amending this section and enacting this note].' "

the United States Supreme Court observed in *Gozlon-Peretz v. United States* (1991) 498 U.S. 395, 404 [112 L.Ed.2d 919, 111 S.Ct. 840], "It is well established that, *absent a clear direction by Congress to the contrary*, a law takes effect on the date of its enactment." (Italics added.) The Supreme Court, however, did not require *express* language in order for the effective date to be other than the date of enactment.

The Junk Fax Act mandates that the FCC promulgate implementing regulations. "The [FCC] *shall prescribe regulations to implement the requirements of this subsection. In implementing the requirements of this subsection,* the [FCC] . . . [¶] . . . [¶] *shall* provide that a notice contained in an unsolicited advertisement complies with the requirements under this subparagraph . . . ." (47 U.S.C. § 227(b)(2)(D), italics added.) When assigned its usual and ordinary meaning and construed in context, that language supports the proposition that Congress gave "a clear direction" (*Gozlon-Peretz v. United States, supra*, 498 U.S. at p. 407) that the Junk Fax Act's new opt-out notice requirements would not be effective immediately. Congress charged the FCC, as the agency responsible for enforcing the act, with the responsibility of promulgating regulations to implement the requirements of the Junk Fax Act. That mandate strongly suggests that enforcement of the Junk Fax Act's new requirements would be dependent upon implementing regulations. That Congress intended to delay the effective date of the new notice requirements until such time as the FCC had, in its discretion, specified various requirements of the act is also evident from the language in the statute expressly vesting the FCC with the discretion (i) to determine the time period within which the sender of an unsolicited facsimile advertisement must comply with a request from a recipient not to send any further advertisements (47 U.S.C. § 227(b)(2)(D)(ii)); and (ii) to determine which classes of small businesses were to be exempt from the requirements of the act (47 U.S.C. § 227(b)(2)(D)(iv)(II)).

The Junk Fax Act also required the FCC to promulgate implementing regulations within 270 days of the passage of the act. (See fn. 7, *ante.*) The specification of such a timeframe, when read in conjunction with the mandatory language requiring implementing regulations, further supports the conclusion that Congress gave "a clear direction" that the Junk Fax Act's opt-out notice requirements would become binding and effective following the promulgation of regulations.

In *Sweet v. Sheahan* (2d Cir. 2000) 235 F.3d 80 (*Sweet*), the Second Circuit Court of Appeals was asked to determine the effective date of certain lead paint disclosure requirements specified in the Residential Lead-Based Paint

Hazard Reduction Act of 1992 (Lead-Based Paint Act).[8] Analogous to what occurred here, the defendant landlord's liability to the plaintiff under the statute at issue in *Sweet* was dependent upon the date the disclosure requirements in the statute became effective as to the landlord. (235 F.3d at p. 86.) The issue, as phrased by the court of appeals, was: "As of what date did [the defendant landlord] become legally obligated to comply with the federal lead-paint disclosure requirements? Was it: (1) October 28, 1995, the date the statute states the regulations would become effective and which was before [the plaintiff] leased the apartment from [the defendant landlord]; or (2) December 6, 1996, the date set forth by the agencies in the Federal Register and Code of Federal Regulations as the effective date of the regulations? If the answer is the former, then [the defendant landlord] would have owed a duty of disclosure to [the plaintiff] and subject matter jurisdiction would exist, but if the latter date is applicable, then [the plaintiff's] federal claim would have no basis and subject matter jurisdiction would be lacking." (*Sweet, supra,* 235 F.3d at p. 86.)

Although the statute at issue in *Sweet, supra,* 235 F.3d 80, specified a date upon which implementing regulations would become effective, i.e., October 28, 1995, the agencies responsible for promulgating those regulations[9] missed that deadline and instead set December 6, 1996, as the date their regulations would become effective. (*Sweet,* at p. 85, fn. 4.) After examining the statute, regulations, and the corresponding legislative history, the court in *Sweet* held that "[the plaintiff landlord's] duty of disclosure did not accrue before December 6, 1996, the date the [responsible] agencies established as the effective date for the regulations." (*Id.* at p. 86.) According to the court in *Sweet,* "the plain language of the statute establishes that the [responsible regulatory agencies] had an obligation to promulgate regulations that implemented the disclosure obligations; *the statute itself does not create such obligations* on property owners. Our conclusion that the regulations, and not the statute, created the enforceable obligations on private parties is supported by the fact that, in the absence of Congressional direction, the [responsible] agencies were compelled to make a number of decisions in the regulations without which the duties of those private parties would not have been clear." (*Ibid.,* italics added.) The court in *Sweet* interpreted the statute at issue there to impose "obligations on the agencies to promulgate regulations which will then—and only then—impose [disclosure] obligations on sellers and lessors. [The defendant] thus had no disclosure obligation until the regulations became effective." (*Id.* at pp. 86–87; see also *Sipes ex rel. Slaughter v. Russell* (D.Kan. 2000) 89 F.Supp.2d 1199.)

---

[8] 42 United States Code sections 4851 through 4856.

[9] The Department of Housing and Urban Development and the Environmental Protection Agency were charged under the Lead-Based Paint Act with promulgating implementing regulations. (*Sweet, supra,* 235 F.3d at p. 84.)

In the instant case, the Junk Fax Act, like the Lead-Based Paint Act in *Sweet, supra*, 235 F.3d 80, mandated that the agency responsible for enforcing the requirements of the Junk Fax Act—the FCC—promulgate regulations to implement the opt-out notice requirements of the act, and that such regulations were to be issued within 270 days. Moreover, as was the case in *Sweet*, the Junk Fax Act left certain aspects of the implementing regulations to the discretion of the FCC. For example, Congress expressly contemplated a time limit for responding to a recipient's opt-out request, but left the precise length of time to the FCC. Absent a regulation specifying the time period within which a sender must respond, the duties of a sender in that regard would have been unclear. Similarly, Congress also provided that some types of small businesses would be exempt from the opt-out notice requirement, but left the determination of which specific types of businesses to the FCC. Therefore, unless and until the FCC promulgated regulations specifying the classes of small businesses that were exempt, the duties of small businesses under the Junk Fax Act also would have been unclear. By allowing the FCC both the discretion and the time to provide certain details of the opt-out notice requirements of the act—in the form of mandatory implementing regulations—Congress manifested an intent to delay the effective date of the statutory notice requirements to the date those regulations issued, i.e., August 1, 2006.

Plaintiff points out that Congress, in the Original Act, expressly provided for a delayed effective date for the purpose of promulgating regulations in the future, and yet did not do so in the Junk Fax Act. That distinction, although a reasonable point, is not dispositive. The language in the Junk Fax Act evidencing the need for the regulations to make certain details of the Junk Fax Act comprehensible outweighs the significance of the omission of an express delayed, effective date. Moreover, the language in the Original Act reflects the concern of Congress for the necessity of businesses to adjust to the new statute as further defined by regulations. That same concern is demonstrated in the Junk Fax Act as to the opt-out provision by requiring the FCC to issue regulations to implement the amendments within 270 days. It would make little sense to delay the effective date for implementing regulations in one instance and not in the other. Accordingly, the Junk Fax Act's opt-out notice requirement was not operative at the time of the fax ad.

E. *Established Business Relationship Exemption Under the Original Act*

Plaintiff argues that even assuming the opt-out notice requirements of the Junk Fax Act did not become effective until August 1, 2006—well after the transmission of the fax ad—defendant nevertheless violated the prohibitions on unsolicited facsimile advertisements in the Original Act, regardless of

whether defendant had an established business relationship with plaintiff. According to plaintiff, although the Original Act contained an express established business relationship exemption from the prohibition on "telephone solicitation," there was no such express exemption from the prohibition on unsolicited facsimile advertisements. As plaintiff reads the Original Act, the only defense available to a sender of an unsolicited facsimile advertisement under that act was prior express permission from the recipient. Because defendant did not obtain such permission in this case, plaintiff contends defendant violated the prohibition on unsolicited facsimile advertisements in the Original Act.

In making its argument, plaintiff concedes that in 1992 the FCC recognized the existence of an established business relationship exemption from the prohibition on unsolicited facsimile advertisements, albeit in a footnote in its administrative commentary,[10] and that the FCC repeatedly delayed implementation of a subsequent rule eliminating that exemption. Plaintiff contends the FCC's recognition of the exemption for unsolicited facsimile advertisements was a nullity because it conflicted with the express terms of the Original Act. Plaintiff therefore urges us to conclude that the FCC's recognition of an established business relationship exemption for facsimile advertisers legally was void *ab initio*.

"The Hobbs Act, 28 U.S.C. § 2342, gives the federal courts of appeals 'exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47.' *Id.* Section 402(a), in turn, encompasses 'any proceeding to enjoin, set aside, annul, or suspend any order of the Commission under [the Communications Act of 1934, as amended by the Telecommunications Act of 1996],' with exceptions not relevant here. Together, these two statutes 'vest the courts of appeals with exclusive jurisdiction to review the validity of FCC rulings.' *Wilson v. A.H. Belo Corp.*, 87 F.3d 393, 396–97 (9th Cir. 1996). Aggrieved parties may invoke this exclusive jurisdiction 'only by filing a petition for review of the FCC's final order in a court of appeals naming the United States as a party.' [*US West Conmmunications v.*] *MFS Intelenet* [(9th Cir. 1999)] 193 F.3d [1112,] 1120; *see also* 28 U.S.C. §§ 2342, 2344." (*U.S. West Communications v. Hamilton* (9th Cir. 2000) 224 F.3d 1049, 1054 (*U.S. West*).)

In *U.S. West, supra*, 224 F.3d 1049, the plaintiff argued that a provision in a "Local Competition Order" released by the FCC was not a final order and

---

[10] There is no contention that the established business relationship exemption was not in compliance with the Administrative Procedure Act, 5 United States Code section 511 et seq., or any other provision.

therefore that the provision could be reviewed without complying with the requirements of the Hobbs Act. The court in *U.S. West* disagreed: "[The plaintiff] argues, however, that [the challenged provision of the Local Competition Order] is not a 'final order' of the FCC and that the Hobbs Act therefore does not bar our review. We are not persuaded. In *Sierra Club v. United States Nuclear Regulatory Commission*, 862 F.2d 222 (9th Cir. 1988), we held that agency orders are 'final orders' for the purposes of the Hobbs Act 'if they impose an obligation, deny a right, or fix some legal relationship as a consummation of the administrative process.' *Id.* at 225. In 1997, the Supreme Court held that, '[a]s a general matter, two conditions must be satisfied for agency action to be "final": First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.' " (224 F.3d at p. 1054.)

Plaintiff, using the same reasoning as the plaintiff in *U.S. West, supra*, 224 F.3d 1049, argues that the FCC's recognition of an established business relationship exemption from the prohibition of unsolicited facsimile advertisements is not a formal regulation or final order of the FCC and therefore is reviewable on appeal, notwithstanding the requirements of the Hobbs Act, which gives federal appeals courts "exclusive jurisdiction" to invalidate formal orders of the FCC. Given that the FCC's finding of such an exemption was first published in 1992, and that the FCC repeatedly published orders acknowledging the continued existence of the exemption, plaintiff's argument is unpersuasive. As in *U.S. West*, the exemption was the culmination of the FCC's decisionmaking process, and, for well over a decade, it constituted an administrative action " 'by which rights or obligations have been determined, or from which legal consequences [have] flow[ed].' " (*U.S. West, supra*, 224 F.3d at p. 1054.) For example, the Court of Appeal in *Kaufman v. ACS Systems, Inc.* (2003) 110 Cal.App.4th 886 [2 Cal.Rptr.3d 296] relied on the exemption as part of its First Amendment analysis in that case. "[T]he '[Original Act] does not act as a total ban on fax advertising.' (*Missouri ex rel. Nixon v. American Blast Fax, Inc.* [(8th Cir. 2003)] 323 F.3d [649,] 659.) *A fax broadcaster may send advertisements to those with whom it or the advertiser has an established business relationship.* Fax broadcasters and advertisers may also obtain consent for their faxes through mailings, telephone calls made in accordance with telemarketing regulations, and interaction with customers at their places of business. (*Ibid.; Van Bergen v. State of Minn.* [(8th Cir. 1995)] 59 F.3d [1541,] 1556; *Moser v. F.C.C.* (9th Cir. 1995) 46 F.3d 970, 975; 47 U.S.C. § 227; 47 C.F.R. § 64.1200 (2003); 15 U.S.C. §§ 6101–6108; 16 C.F.R. §§ 310.1–310.9 (2003).)" (*Kaufman v. ACS Systems, Inc., supra*, 110 Cal.App.4th at p. 911, italics added.) The established business relationship exemption under the Original Act, as consistently recognized by the FCC, is a

final order for purposes of the Hobbs Act. (Contra, *Gottlieb v. Carnival Corp.* (E.D.N.Y. 2009) 595 F.Supp.2d 212, 219, fn. 5.)[11] The issue of the regulation's validity is therefore subject to the exclusive jurisdiction of the federal courts of appeals.[12] Thus, plaintiff has not established that under the Original Act, defendant may not invoke the established business relationship defense.

For the foregoing reasons, I would affirm the judgment.

---

[11] There are authorities applying or acknowledging the established business relationship exemption before the enactment of the Junk Fax Act. (See, e.g., *Kaufman v. ACS Systems, Inc.,* *supra,* 110 Cal.App.4th at p. 911; *Accounting Outsourcing, LLC v. Verizon Wireless Personal Comms.* (M.D.La. 2004) 329 F.Supp.2d 789, 808; *Carnett's, Inc. v. Hammond* (2005) 279 Ga. 125 [610 S.E.2d 529, 531]; *Lampkin v. GGH, Inc.* (2006) 2006 OKCIVAPP 131 [146 P.3d 847, 854].)

[12] A judgment refusing to determine an issue on the ground of lack of jurisdiction is not ordinarily res judicata. (*Shore v. Shore* (1954) 43 Cal.2d 677, 681 [277 P.2d 4]; see also 7 Witkin Cal. Proc. (5th ed. 2008) Judgment, § 379, p. 1007 ["A judgment of dismissal has res judicata effect only if it is on the merits."].)