Filed 11/26/13  In re D.W. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| In re D.W. et al., Persons Coming Under the Juvenile Court Law. | |
| BUTTE COUNTY DEPARTMENT OF EMPLOYMENT AND SOCIAL SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>M.C.,<br><br>        Defendant and Appellant. | C071335<br><br>(Super. Ct. Nos. J34860, J35929) |

        M.C., mother of the minors, appeals from orders of the juvenile court denying her petition for modification contending that ruling was in error.

        Further, the court found the minors were likely to be adopted and, identifying adoption as the permanent plan goal without terminating parental rights, continued the selection and implementation hearing.  (Welf. & Inst. Code, §§ 366.26, 388, 395; unless otherwise stated, all statutory references that follow are to the Welfare and Institutions

1

Code.)  Mother argues the beneficial parent-child relationship precludes identification of adoption as a permanent plan.  Mother contends there was insufficient evidence the minors were likely to be adopted and the court prematurely selected adoption as the permanent plan, thereby foreclosing other possible plans.

Because the finding of adoptability is inconsistent with the court's order continuing the hearing without terminating parental rights, we asked for supplemental briefing directing the parties to identify the authority which permitted the court to enter such findings and orders.  We conclude that, having found the minors were likely to be adopted, the juvenile court was required to terminate parental rights.  As a consequence, we reverse the orders appealed from and direct the juvenile court to enter an order terminating parental rights.  Because mother's arguments were directed to a set of circumstances which arose from unauthorized orders, we shall address those arguments, insofar as they can be read to attack an order terminating parental rights.

## FACTS AND PROCEEDINGS

The Butte County Department of Employment and Social Services (the Department) filed a petition to detain two-year-old D.W. in July 2009 due to her parents' substance abuse which included methamphetamine and marijuana.  The juvenile court sustained the petition in September 2009.  The court removed the minor from parental custody, ordered reunification services for mother and bypassed reunification services for the father.  In January 2011, the juvenile court returned the minor to mother's custody under a family maintenance plan.

In June 2011, the Department filed a non-detention petition for the infant, C.W., based on mother's history of methamphetamine abuse, her current failure to participate fully in her family maintenance services and her two positive tests for marijuana in the preceding month.  The court sustained the petition.

2

The family maintenance review report stated mother admitted she had been using drugs for several months and falsified her drug tests to avoid detection. She had discontinued services and had positive drug tests. Mother was directed to participate in additional services for parenting and substance abuse and relapse prevention. The report recommended further family maintenance services. At the review hearing, the court was informed the mother was in custody and the hearing was continued.

In July 2011, the Department filed a supplemental petition to detain four-year-old D.W. and a subsequent petition to detain four-month-old C.W. The petitions alleged, in addition to mother's history of substance abuse and recent relapse, that mother, with D.W. present, was arrested on a probation violation for being under the influence of alcohol and causing a disturbance. Mother was sentenced to enter residential treatment when released from custody. The court detained the minors and subsequently sustained the petitions.

The disposition report recommended denying further services to both parents. The report provided mother's criminal history which included an arrest in October 2008 for disorderly conduct and being under the influence of a drug; an arrest in February 2009 for similar charges; an arrest in September 2009 for receiving stolen property and the recent probation violation. At the time of the report, mother was in a sober living facility following her release from jail, her tests were negative and she was participating in a drug recovery program. She had completed several parenting classes and was planning on taking another one. The report concluded mother was now embracing services, but had a troubling pattern of out of control behavior when under the influence which led to several arrests. Mother minimized her arrest history as "normal." Following a contested disposition hearing, the court denied services for both parents and set a selection and implementation hearing. Mother's writ challenge to this ruling was denied.

In February 2012, mother filed a petition for modification as to D.W. seeking return of the minor under a plan of family maintenance and alleging her ongoing sobriety

3

and participation in recovery programs as changed circumstances. She alleged the changed order was in the minor's best interests because D.W. would be in a secure and loving environment, there were strong bonds between D.W. and mother, and mother had benefitted from her services which prepared her to provide care and permanence for the minor.

The California Department of Social Services (CDSS) prepared an assessment for the selection and implementation hearing. CDSS concluded the minors were likely to be adopted and recommended termination of parental rights with a plan of adoption. D.W. was in good health and at or above her developmental level. She believed she was in foster care because her mother did not like her. She was very attached to mother but also to her foster mother. She had a strong need to be in control and was in weekly play therapy. D.W. was sad when told she was not returning to mother and was anxious and worried about her future. Mother told D.W. she was going to live with her uncle and aunt and the minor seemed to accept it as established rather than as a potential plan. The CDSS adoption specialist saw D.W. as resilient and open to moving to Missouri to live with her paternal aunt and uncle. D.W. had visited the uncle and aunt in 2010, but did not remember the trip. C.W. was a healthy, happy baby who was too young to understand adoption.

The assessment stated that mother visited regularly and the minors were comfortable with her. The paternal grandmother visited the minors and facilitated telephone contact between D.W. and the uncle in Missouri. The paternal aunt and uncle constituted a potential adoptive family, had applied for placement and were willing to adopt the minors. They had legal guardianship of the aunt's niece, appeared to be capable of meeting the minors' needs and were committed to providing permanence for them. The paternal aunt and uncle stated they were willing to adopt the minors. The CDSS's preliminary evaluation found the potential adoptive parents to be suitable and

4

committed to adopting the minors. The adoptions specialist concluded the minors were likely to be adopted if parental rights were terminated.

The Department also filed a report for the selection and implementation hearing. The report stated the minors were in good health and developmentally on target. D.W. was having some behavioral issues, showing defiance both at home and at school and suffered from incontinence that appeared to arise from psychological issues. An Interstate Compact for Placement of Children (ICPC) assessment was requested for placing the minors in Missouri with the paternal uncle and aunt. The report recommended that the minors be ordered into a permanent plan with a goal of adoption and the case be continued to identify an appropriate adoptive family.

In March 2012, mother filed a petition for modification as to C.W., seeking return of the minor with family maintenance services. She alleged, as changed circumstances, her continued sobriety in a sober living environment, where she could have the minor with her, and her consistent employment. She alleged the modification was in the minor's best interests because she had benefitted from her services and was able to provide for his care and give him permanency.

The combined hearing on the petitions for modification and selection and implementation of a permanent plan commenced in April 2012. The social worker for the foster family agency, Karen Hetherington, testified she supervised visits which had decreased in frequency after services were terminated. D.W. would run to mother and hug her at the start of visits. Hetherington never saw inappropriate conduct by mother in visits but did coach her occasionally on parenting issues. Hetherington stated the minor had a very strong bond with her mother because when she visited D.W. at home and at school, D.W. always asked about mother. Hetherington testified that, during the last few months, after being told she was not going home, D.W.'s behavioral issues had escalated at home and at school to include frequent intentional urination and stealing. When asked for an explanation, D.W. said that if she intentionally and frequently urinated and was

5

bad enough she could go home with mother because she did not like the foster home. Attempts by the foster mother to manage D.W.'s recent behavioral issues were not successful and the minors were moved to a new home. The intentional urination had stopped and D.W. had not stolen anything since the change of placement. Hetherington stated that the instability resulting from being told she was moving to another state or possibly home and lack of permanency in the foster placement had an impact on D.W. because she did not understand and was confused. Since her placement in the new foster home things have been more stable and D.W. got more one-to-one attention.

A counselor for mother's substance abuse recovery program testified about the program structure and mother's progress since July 2011.

The Department's social worker agreed with Hetherington that D.W.'s behavior had improved over time but believed the improvement started before the last placement change. He was not in favor of returning to a family maintenance plan because he did not think it was safe to return the minors to mother's custody based on her history and the totality of the circumstances. He testified that the Department was asking for a permanent plan of adoption without terminating parental rights because the ICPC approval for placement had just come but an additional assessment for adoption had to be done. The Missouri relatives were coming to California for an extended visit to participate in transitioning the minors. When asked about guardianship, the social worker stated that after placement, if the relatives wanted guardianship it would be considered as an alternative. He did not think that mother's proposed modification was in the minors' best interests based on her history in treatment, the redetention after family maintenance and her pattern of criminal involvement. He did not think mother was currently ready to take care of the minors.

The CDSS adoptions specialist testified she had told D.W. she was not going home and was aware that mother had told her she was doing better and promised that the minor would return home. She was also aware of D.W.'s recent behavioral issues and the

steady improvement in the new placement. She believed much of D.W.'s behaviors were based on anxiety. The current foster home was open to being a permanent home for the minors. The minors were capable of attaching to a new caretaker and would benefit from the security of adoption. She testified that the Department and the CDSS agreed the minors should be adopted, the only difference of opinion was whether parental rights should be terminated now or later.

A senior social worker for the Department who oversaw the dependency from February 2010 until after mother's arrest in July 2011, testified the main concerns were mother's sobriety, immaturity, lack of self-sufficiency skills and lack of housing. She described mother's relapse after C.W.'s birth, culminating in her arrest. However, she believed mother did better in women's programs and her support system with women seemed to be the missing link in her recovery.

A counselor from Stepping Stones described mother's progress in the program and her growth in maturity and life skills. The counselor believed she did not present a danger to the minors and had the ability to parent them.

Mother testified about her relapse and subsequent progress in recovery. She would be on felony probation until April 2013 and continued sobriety was a condition of her probation.

Regarding the petition for modification, the court found mother established changed circumstances but had failed to show that it was in the minors' best interests to return to a family maintenance plan. The court pointed to mother's substance abuse which led to D.W.'s removal and her continued drug use after C.W. was born and while on felony probation. The court noted that when she was arrested in July 2011, she was so drunk she was incapable of caring for herself and had D.W. with her. The court found clear and convincing evidence that the minors were likely to be adopted, identified adoption as the goal, and found efforts had been made to locate an appropriate adoptive family. The court did not find any exception to the preference for adoption as a

7

permanent plan and did not terminate parental rights, setting a further selection and implementation hearing.

DISCUSSION

I

*The Petitions for Modification*

Mother argues the court erred in failing to grant her petitions for modification because the evidence showed the modification was in the minors' best interests.

"Any parent . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court." (§ 388, subd. (a)(1) .) The court must set a hearing if "it appears that the best interests of the child . . . may be promoted by the proposed change of order . . . ." (§ 388, subd. (d).) "The parent requesting the change of order has the burden of establishing that the change is justified. [Citation.] The standard of proof is preponderance of the evidence. [Citation.]" (*In re Michael B.* (1992) 8 Cal.App.4th 1698, 1703.) Determination of a petition to modify is committed to the sound discretion of the juvenile court and, absent a showing of a clear abuse of discretion, the decision of the juvenile court must be upheld. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319; *In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.) The best interests of the child are of paramount consideration when the petition is brought after termination of reunification services. (*Stephanie M.*, at p. 317.) In assessing the best interests of the child, the juvenile court looks not to the parent's interests in reunification but to the needs of the child for permanence and stability. (*Ibid.*; *In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)

Mother had shown sufficient progress after more than 12 months of services to have D.W. returned to her care. However, soon after D.W.'s return mother was not fully

8

participating in family maintenance services, relapsed into substance abuse, falsified drug tests and was arrested, thereby demonstrating she had not benefitted from the prior extensive services. Both D.W. and C.W. were removed from her care. Subsequently, mother engaged in substance abuse treatment as a condition of probation and maintained her sobriety for over eight months. Mother had also completed several parenting classes. Nonetheless, she still required coaching on parenting issues and had never dealt with the stresses inherent in raising two young children. The social worker did not think she was ready to take care of the minors.

Mother's history in treatment, the failure of the prior family maintenance period and her pattern of criminal involvement when under the influence indicated a lack of basic stability. Mother was making progress but was still early in her recovery and sobriety. By the time of the hearing, mother had been in and out of services for three years in her search for sobriety. While she was currently doing well, the young minors had not had a stable home during this time and D.W. was showing the negative effects of the uncertainty in her life. Mother presented no evidence beyond D.W.'s bond to her and a desire to return home to support a finding of best interests. The minors' best interests could not be served by extending the upheaval they had experienced. Both minors needed a permanent home. The juvenile court did not abuse its discretion in denying the petitions for modification.

II

*Termination of Parental Rights*

The court found by clear and convincing evidence the minors were likely to be adopted but did not terminate parental rights. We asked for supplemental briefing on the authority which permitted this action.

Mother argues that the court was relying on section 366.26, subdivision (c)(3). That section provides, in relevant part: "If the court finds that termination of parental rights would not be detrimental to the child pursuant to paragraph (1) [which provides for

9

various exceptions to termination of parental rights if certain circumstances which establish termination of parental rights would be detrimental to the minor have been shown] *and* that the child has a probability for adoption but is difficult to place for adoption *and* there is no identified or available prospective adoptive parent, the court may identify adoption as to permanent placement goal and without terminating parental rights, order that efforts be made to locate an appropriate adoptive family for the child . . . within a period not to exceed 180 days." (Italics added.)

The court did not make all of these three findings. First, the court did not find that termination of parental rights would not be detrimental to the minors, it made no findings at all on any of the exceptions and none were litigated by the parties. Second, the court found the minors were *likely to be adopted*, necessarily precluding a finding either minor was difficult to place. Third, the court did not find there was no identified or available prospective adoptive parent, it found only that efforts had been made to locate an adoptive family. Even assuming this last finding was adequate, the other two findings were not made. Without making the predicate findings the court could not proceed under section 366.26, subdivision (c)(3).

We recognize there is some ambiguity in the JV-320 form in that it separates the necessary findings from the order in items 13 and 14 of the form. But, the court's authority to act arises from the legislative enactment, not from a Judicial Council form and it must act in accordance with the statute even if the parties agree to the contrary. (*Magana Cathcart McCarthy v. CB Richard Ellis, Inc*. (2009) 174 Cal.App.4th 106, 116.)

The Department argues that the finding the minors were likely to be adopted mandated an order terminating parental rights. We agree.

At the selection and implementation hearing held pursuant to section 366.26, the court selects from several alternatives for a permanent plan. (§ 366.26, subd. (b).) The preferred plan is adoption. ( *In re Ronell A*. (1996) 44 Cal.App.4th 1352, 1368 .) If the court finds "that it is likely the child will be adopted, the court *shall* terminate parental

rights and order the child placed for adoption. The fact that the child is not yet placed in a preadoptive home nor with a relative or foster family who is prepared to adopt the child, shall not constitute a basis for the court to conclude that it is not likely the child will be adopted." (§ 366.26, subd. (c)(1), italics added.)

Once the court found the minors were likely to be adopted, it was required to terminate parental rights. No one objected to the finding of adoptability or suggested that any exception to termination applied. On this record, the court erred in failing to terminate parental rights. If substantial evidence supports the finding the minors were likely to be adopted, the orders continuing the case to find an adoptive family without terminating parental rights must be reversed. We address the remaining issues insofar as possible.

A. *Adoptability*

Mother argues substantial evidence did not support a finding the minors were likely to be adopted.

Determination of whether a child is likely to be adopted focuses first upon the characteristics of the child. (*In re Sarah M*. (1994) 22 Cal.App.4th 1642, 1649.) The existence or suitability of the prospective adoptive family, if any, is not relevant to this issue. (*Ibid*.; *In re Scott M*. (1993) 13 Cal.App.4th 839, 844.)

The minors were young, healthy and developmentally on target. C.W. had no behavioral or other issues and was clearly adoptable. D.W. had recently exhibited intentional urination and stealing which she acknowledged were intended to result in being removed from the foster home she was in and returned to mother. When she was removed from that foster home and placed in another home where she got more attention, the behaviors decreased or stopped altogether. Substantial evidence supports the juvenile court's finding. (*In re Angelia P*. (1981) 28 Cal.3d 908, 924; *In re Jason L*. (1990) 222 Cal.App.3d 1206, 1214.) The fact that D.W. is bonded to mother does not make her

11

less likely to be adopted. Evidence of the strength and quality of the parent-child bond is relevant to establishing an exception to the preference for adoption, it does not affect the finding of adoptability per se. (§ 366.26, subd. (c)(1)(B)(i).)

We note that mother attempts to rely on evidence subsequent to this hearing tending to show that D.W.'s problems are far more severe than it appears from the record. Obviously this evidence was not before the juvenile court and cannot affect the substantial evidence calculation.

B.     *Relative Guardianship Exception*

Mother argues the court prematurely selected adoption as the permanent plan which foreclosed a permanent plan of legal guardianship or long term foster care. Mother relies on the relative guardianship exception found in section 366.26, subdivision (c)(1)(A).

As we have seen, once the court found the minors likely to be adopted, the court had to select a permanent plan of adoption unless an exception to the preference of adoption was established. By its terms, the relative guardianship exception could not apply since it requires that the child "is living with a relative" "who is willing and capable of providing the child with a stable and permanent environment through legal guardianship, and the removal of the child from the custody of his or her relative would be detrimental to the emotional well-being of the child." (§ 366.26, subd. (c)(1)(A).)

Here, the children were not living with a relative at the time of the hearing and had no relationship with relatives who were being considered for adoption. The social worker testified that, at a later date, if necessary, this option could be explored. The juvenile court did not err in failing to consider this exception to adoption.

The alternative of long-term foster care is not preferred and where the minors are likely to be adopted may not be considered. (§ 366.26, subd. (c)(1).)

C.    *Beneficial Relationship Exception*

Mother argues the beneficial relationship between herself and the minors should have prevented identification of adoption as a permanent plan.

We observe that mother did not present evidence or argue that the benefit exception should apply to defeat termination of parental rights and did not object to the court's finding the minors were likely to be adopted.  Mother has forfeited the issue for failing to raise it in the trial court.  (*In re Christopher B*. (1996) 43 Cal.App.4th 551, 558; *In re Dakota S*. (2000) 85 Cal.App.4th 494, 501-502.)

Even assuming the issue was not forfeited, mother cannot prevail.  The party claiming the exception has the burden of establishing the existence of any circumstances which constitute an exception to termination of parental rights.  (*In re Cristella C*. (1992) 6 Cal.App.4th 1363, 1373; *In re Melvin A*. (2000) 82 Cal.App.4th 1243, 1252; Cal. Rules of Court, rule 5.725(e)(3); Evid. Code, § 500.)

Termination of parental rights may be detrimental to the minor when:  "The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)  However, the benefit to the child must promote "the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.  In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated."  (*In re Autumn H*. (1994) 27 Cal.App.4th, 567, 575.)  Even frequent and loving contact is not sufficient to establish this benefit absent a significant positive emotional attachment between parent and child.  (*In re Teneka W*.

13

(1995) 37 Cal.App.4th 721, 728-729; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419; *In re Brian R.* (1991) 2 Cal.App.4th 904, 924.)

There was evidence of regular visitation and some evidence of a strong bond between D.W. and mother.  However, the court had to weigh the benefit of continuing the natural parent/child relationship against the benefit of permanency.  Given the minor's escalated behavioral problems as her anxiety about her future and her confusion increased, the court properly concluded the greater benefit was in stability.

## DISPOSITION

The orders of the juvenile court are reversed.  The juvenile court is directed to vacate its order continuing the selection and implementation hearing and enter an order terminating parental rights.


      HULL      , Acting P.  J.


We concur:


     ROBIE     , J.


     DUARTE    , J.